```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                      FORT PIERCE DIVISION

 3                CASE NO. 15-CR-14057-ROSENBERG

 4

     UNITED STATES OF AMERICA,      .
 5                                   .
         Plaintiff,                  .
 6                                   .
              vs.                    .
 7                                   .
     MICHAEL HARDING,                .  Fort Pierce, FL
 8                                   .  May 23, 2016
                                     .
 9       Defendant.                  .

10

                TRANSCRIPT OF SENTENCING PROCEEDINGS
11          BEFORE THE HONORABLE ROBIN L. ROSENBERG
                   UNITED STATES DISTRICT JUDGE
12
                            VOLUME 2
13

14       APPEARANCES:

15

         FOR THE PLAINTIFF:        DANIEL FUNK
16                                 RUSSELL KILLINGER
                                   United States Attorney's Office
17                                 101 S. U.S. Highway 1
                                   Suite 3100
18                                 Fort Pierce, FL 34950
                                   305-905-7509500
19

20       FOR THE DEFENDANT:        FLETCHER PEACOCK, ESQ.
                                   Federal Public Defender's Office
21                                 109 North 2nd Street
                                   Fort Pierce, FL 34950
22                                 772-489-2123

23

         Official Court Reporter:  Pauline A. Stipes
24                                 Fort Pierce/West Palm Beach
                                   772-467-2337
25                                 HON. ROBIN L. ROSENBERG
```

```
 1                              INDEX

 2           WITNESSES:

 3           MICHAEL BRANNON

 4           Direct Examination by Mr. Peacock      Page 7

 5           Cross Examination by Mr. Funk          Page 21

 6           Redirect Examination by Mr. Peacock    Page 32

 7           BRIAN REY (Continued)

 8           Direct Examination by Mr. Funk         Page 35

 9           ASHLEY HARDING

10           Direct Examination by Mr. Killinger    Page 55

11           Cross Examination by Mr. Peacock       Page 87

12           Redirect Examination by Mr. Killinger  Page 95

13           WAYNE WALKER

14           Direct Examination by Mr. Funk         Page 98

15           Cross Examination by Mr. Peacock       Page 103

16           Redirect Examination by Mr. Funk       Page 104

17           JULIE HARDING

18           Direct Examination by Mr. Peacock      Page 106

19           ELIZABETH PERRY

20           Direct Examination by Mr. Peacock      Page 115

21

22

23

24

25
```

```
1                         EXHIBITS

2                                    I.D.          Received

3              Government Exhibit 11               Page 48
               Government Exhibit 12               Page 51
4              Government Exhibit 13               Page 53
               Government Exhibit 10               Page 54
5              Government Exhibit 14               Page 82

6                 (All Exhibits Sealed)
```

1          THE COURT:  Good morning, you may be seated.

2          Okay, good morning.  We are here on the matter of

3     United States of America versus Michael Edwin Harding.

4     15-14057, and it is a continuation of the sentencing of Mr.

5     Harding that we began last Monday, May 16th.

6          If we could have all counsel state their appearance

7     for the record and the appearance of Mr. Harding.

8          MR. FUNK:  Daniel Funk on behalf of the United States,

9     with Russell Killinger, Assistant United States Attorney, and

10    Brian Rey, Homeland Security Investigations.

11         THE COURT:  Good morning.

12         MR. PEACOCK:  Fletcher Peacock on behalf of Michael

13    Harding, who is also present before the Court.

14         THE COURT:  Okay, good morning.

15         We left off last time with Special Agent Brian Rey on

16    the stand.

17         I think we had gotten up to Exhibit 9 and -- I think I

18    need to get that exhibit list from you, Lakeshia.

19         Right, Exhibit 9, and they are all under seal.

20         As I understand it, Special Agent Rey was going to

21    come back on the stand for half an hour on direct and 15

22    minutes of cross.

23         Now, a couple of additional filings came in.

24         There was a motion to permit Dr. Michael Brannon to

25    testify by telephone that was filed on May 20th, Docket Entry

```
1    101.
2              I understand the Government doesn't have an objection;
3    is that correct?
4              MR. FUNK:  That is correct.
5              THE COURT:  Okay, when we get to Dr. Brannon, we will
6    get to him by phone.  The only thing we need to make sure is
7    that he is on a land line and holding the phone handle so we
8    can hear him clearly.  We find that speaker and cell phones
9    don't work out well.
10             MR. PEACOCK:  Your Honor, we had anticipated putting
11   him on first thing this morning.
12             MR. FUNK:  Yes.
13             MR. PEACOCK:  He is awaiting testimony in a first
14   degree murder trial in Broward.  I did confirm he is there
15   right now.
16             He does have a cell phone.
17             THE COURT:  We will see how it works.
18             Our experience has been irregular with cell phones.
19   If that is all he has, that is how it works.
20             I anticipate -- I see you have him 30 minutes on
21   direct.
22             MR. PEACOCK:  Yes.
23             THE COURT:  Another filing, docket 103, sealed notice
24   of filing, impact statement that was just filed -- just file
25   stamped May 18.  It was entered in the docket on the 23rd.
```

1              When did the Government file that, the 18th or 23rd?

2              *MR. KILLINGER:*  Filed sealings have to be delivered to

3    the Clerk's Office, there is a lag.

4              *THE COURT:*  It was just made available to me this

5    morning.  I will have to read them.  I read everything else

6    that I had not read, it just became apparent to me literally

7    this morning it was just filed.

8              That is the only filing I see other than Dr. Brannon

9    to appear by telephone.

10             I will make sure I read those before the pronouncement

11   of sentence.

12             Okay, with that, why don't we endeavor to get Dr.

13   Brannon on the phone.

14             MICHAEL BRANNON, GOVERNMENT WITNESS, SWORN

15             *THE COURTROOM DEPUTY:*  Please state your name for the

16   record and spell your last name, please.

17             *THE WITNESS:*  Michael Brannon, B-R-A-N-N-O-N.

18             *THE COURT:*  Good morning, Dr. Brannon.  This is Judge

19   Rosenberg, and we are ready to begin with direct examination by

20   Mr. Peacock, who has anticipated about 30 minutes.

21             I will let you know when 30 minutes has come up, and

22   we can hear you well, thankfully.  If we can't hear you well,

23   we will let you know.

24             *THE WITNESS:*  Thank you, I appreciate the Court

25   allowing me to testify by telephone this morning.

1      *THE COURT:*  Not a problem.  You may proceed.

2      *MR. PEACOCK:*  Thank you, Judge.

3      Your Honor, by agreement of the parties, we would

4  offer Dr. Brannon as a qualified expert in the area of

5  psychological forensic evaluation.

6      *MR. FUNK:*  That is correct, Your Honor.

7      *THE COURT:*  Okay.

8                      **DIRECT EXAMINATION**

9  *BY MR. PEACOCK*:

10 *Q.*  Dr. Brannon, good morning.

11 *A.*  Yes, good morning, Mr. Peacock.

12 *Q.*  Dr. Brannon, briefly, how long have you been a forensic

13 psychologist?

14 *A.*  I have operated in the area of forensic psychologist since

15 1994, licensed as a psychologist since 1990.

16 *Q.*  Have you acted as a forensic psychologist since that time?

17 *A.*  I have, in State and Federal Courts in Florida, as well as

18 other states, and I acted primarily since that time, 1994.

19 *Q.*  Dr. Brannon, did you have the opportunity to evaluate

20 Michael Harding in this case?

21 *A.*  Yes, sir, I did.

22 *Q.*  Was that at my request?

23 *A.*  Yes, sir, it was.

24 *Q.*  And exactly what do you recall that I requested you to do?

25 *A.*  A psychological evaluation to assess whether there are any

1    psychological problems or issues that can be used as part of a

2    mitigation hearing.

3    *Q.*  Now, did you in fact conduct a forensic evaluation of

4    Michael Harding?

5    *A.*  Yes, I did.

6    *Q.*  When did you do that?

7    *A.*  December 30, 2015.

8    *Q.*  Now, in conducting your evaluation, how do you go about

9    doing that?  How do you start out?

10   *A.*  You start off by doing a psychological evaluation, but

11   prior to that time, hopefully becoming aware of some of the

12   facts involved in the case, arrest reports, criminal

13   complaints, whatever you get your hands on as far as the actual

14   fact patterns that occurred, and being able to interview

15   individuals familiar with that, and eventually getting some

16   records that would also corroborate or contradict what a person

17   might have told you during the course of the interview,

18   multiple psychological tests, testing that contain validity

19   scales or measures of the person's response style, and the

20   possibility of a person faking or malingering.

21   *Q.*  Did you do that in this case, get the background

22   information?

23   *A.*  Yes, I did all of those things, case law, psychological

24   testing, collateral source information, being his mother, and

25   prior treatment records.

1    *Q.*  In obtaining background information, did you feel you

2    received satisfactory information in order to conduct an

3    adequate evaluation of Michael Brannon --

4    *A.*  Michael Harding.

5    *Q.*  Michael Harding?

6    *A.*  Yes, I did.  Based on the information I had, I had

7    sufficient information.

8    *Q.*  Now, once you compile your background history and

9    information, do you actually then conduct testing of the

10   subject?

11   *A.*  Yes.  Specific testing with regard to psychological

12   difficulties, problems, substance abuse, as well as what I

13   mentioned earlier, any type of response distortion or lying in

14   the format of the test.

15   *Q.*  And do you choose different tests depending upon the

16   circumstances?

17   *A.*  Sure.  I use different tests depending on what the person

18   tells me, what they relate to me, all of them frequently used

19   tests when sentencing, and I use what they tell me in the

20   course of history to determine what protocol of tests I would

21   use.

22   *Q.*  Tell me a little bit -- what is a psychological test; where

23   does it come from?

24   *A.*  They are objective measures standardized on thousands,

25   sometimes tens of thousands of individuals to establish the

1    presence or absence of psychological conditions, such as

2    depression, anxiety or psychosis.

3        Also, tests in forensic settings also have scales that

4    assess how the person approaches the test itself; do they

5    minimize the problems, do they randomly respond to a test or do

6    they try to exaggerate or fabricate any type of symptoms.

7        So, it is an analysis of not only psychological problems,

8    but do they report those problems, if they have them, in a

9    manner consistent with what we know about mental illness.

10   *Q.*  Now, in choosing the tests that you submitted to Michael

11   Harding, what were your concerns there?

12   *A.*  Well, the concerns were, A, does he have any type of mental

13   health condition, reporting anxiety, depression, possible

14   post-traumatic stress, and past history of substance abuse.  He

15   was indicating all of the problems throughout the course of

16   many years.

17       I chose tests that would assess all of those areas or the

18   malingering that might occur as well of the conditions.

19   *Q.*  Did you also have records of previous psychological

20   treatment for Mr. Harding?

21   *A.*  Yes, sir, I did have those afterwards.  I asked you, Mr.

22   Fletcher, if you could get those records to further

23   corroborate.  Even though I spoke to his mother, I wanted

24   objective measures, and that would be prior treatment records.

25   Yes, we did get those.

1    Q.  What is the importance of having prior the treatment

2    diagnosis and prognosis?

3    A.  It helps to corroborate the person with the treatment

4    records.  We have an individual treated over 16 sessions or a

5    couple of years, and it gives us an objective source of

6    information, what he is reporting and what the severity of the

7    conditions were.

8        It is important to get that forensically when the person

9    has a motivation to be dishonest or information to help them

10   out in their case, if you will.

11   Q.  Do you have the previous diagnosis with you?

12   A.  Yes, I do.

13   Q.  What was the previous diagnosis and when was it from?

14   A.  The diagnosis of the treatment records of his psychiatrist,

15   Dr. Yanique Duval, 16 sessions of psychiatric and psychological

16   treatment, prescribed medication, as well as go through several

17   sessions of individual counseling.

18       He was diagnosed with anxiety disorder, panic disorder, and

19   poly substance abuse, anti-depressants, anti-anxiety

20   medications, most specifically Zoloft and Klonopin.

21   Q.  Now, did that -- to the best of your knowledge, did that

22   treatment appear to be voluntary treatment on Michael Harding's

23   part?

24   A.  It was, yes.

25   Q.  Now, you indicated that you examined him on December 30,

```
 1   2015?
 2   A.  Yes.
 3   Q.  Where did you speak with him?
 4   A.  Federal Detention Center Miami.
 5   Q.  At that time, did you administer your battery of
 6   psychological tests?
 7   A.  I did.
 8   Q.  Could you tell the Court about the tests that you
 9   administered on December 30, 2015?
10   A.  Sure.  Would you like me to list the tests or speak about
11   each test, or both?
12   Q.  Just one second, Dr. Brannon.
13           MR. PEACOCK:  Your Honor, I filed this under seal.
14           THE COURT:  What docket entry was that?
15           MR. PEACOCK:  Judge, I don't have it.
16           THE COURT:  I do have it.  Let's see.
17           MR. PEACOCK:  I have an extra copy.
18           THE COURT:  If you have one, that will make it go
19   quickly.  I have it, I read it.
20           MR. PEACOCK:  I do.  I thought it might be easier to
21   follow along.
22           THE COURT:  Yes, that is fine.
23           Be assured I have received it, it has been filed, and
24   I read it.
25           MR. PEACOCK:  Yes, ma'am.
```

1          *THE COURT:*  In fact, I think it is Docket Entry 90.

2          *MR. PEACOCK:*  Very good.

3    *BY MR. PEACOCK*:

4    *Q.*  Dr. Brannon, I would like you to go through each test

5    briefly, explain what its purpose is, whether you administered

6    it, whether you thought the results were reliable.

7    *A.*  Okay.  I will give a brief summary of each test.  If the

8    Court would like me to elaborate, I will do that.

9          The first test I gave was called the MCMI-III, Millon

10   Clinical Multiaxial Inventory – Third Edition, MCMI-III.  It's

11   a personality test standardized on various individuals with

12   various forms of mental disorders.

13         It is important in a legal setting, it has a variety of

14   scales.  It tells is if someone is malingering or faking

15   disorders.

16         The results of those tests were a valid profile, no faking

17   of mental health symptoms, with significant elevations in areas

18   that would suggest depression, anxiety, post-traumatic stress

19   and alcohol abuse.

20         The next test I gave was the Beck Anxiety Inventory, the

21   single best measure of the construct of anxiety, and he scored

22   in the moderate range, he had a moderate range of anxiety.

23         The next test, Beck Depression Inventory, Second Edition,

24   that is one of the most commonly utilized in clinical studies

25   for depression.

1      That result was in the severe range, more depression than

2  anxiety in his response.

3      The next test, the Substance Abuse Subtle Screening

4  Inventory, specifically measures for drug or alcohol problems,

5  and indeed, it did show problems in both of those areas, and

6  more importantly, all of the tests, meaning for individuals

7  exaggerating substance abuse problems, fell well within the

8  normal range.  There was no evidence of fake or faking

9  substance abuse symptoms.  Elevations that would suggest drug

10  and alcohol problems.

11      The final test that I gave is called the Miller Forensic

12  Assessment of Symptoms Test, a test that is designed to do one

13  thing, measure for faking of mental health symptoms, signs as

14  to malingering.

15      He fell below the cutoff score that would suggest

16  malingering for the test.  This test would tell us no

17  malingering.  The people who score as low as he did, there is

18  generally no malingering in psychological testing.

19  Q.  After you conducted your testing of Mr. Harding, and also

20  all of your background research and information, did you come

21  to a diagnosis of Mr. Harding?

22  A.  Yes, sir, I did.

23  Q.  And when I say diagnosis, what is your definition of that

24  term?

25  A.  Well, these would be classifications from our most recent

1    coded book, which would be the Diagnostic and Statistical

2    Manual, Fifth Edition, the latest version classifying mental

3    disorders.  A person would have to meet within specific

4    criteria within that manual for diagnoses.

5        I diagnosed based on that manual.

6    Q.  When you say our manual, who do you mean by our?

7    A.  It's published by the American Psychiatric Association,

8    with considerable assistance from the American Psychological

9    Association.  A new version was published three years ago, the

10   DSM-5.

11   Q.  Is that DSM-5, is that a learned treatise that is accepted

12   in your profession as an accepted manual of diagnoses of

13   psychological illness?

14   A.  Yes, the most frequently used book for diagnosing

15   individuals.

16   Q.  What was your diagnosis of Mr.  Harding?

17   A.  Based upon the information that was available to me, he

18   best met criteria for persistent depressive disorder,

19   unspecified anxiety disorder, alcohol use and cannabis use, and

20   I also put in what are rule out or considerations diagnoses.

21       I saw some evidence of the conditions, but could not give a

22   full diagnosis, he did not meet the full threshold.  Those were

23   post-traumatic stress and panic disorder.

24           THE COURT:  What do you mean by persistent depressive

25   disorder?

```
 1              THE WITNESS:  This stays for a period of time,
 2   persistent depressive disorder could be associated with
 3   something like a walking flow, something that causes impairment
 4   in a person's life, but they are able to function.  A person
 5   feels low, blue, lethargic, hopeless, not debilitating.
 6              THE COURT:  Are you able to ascertain how long Mr.
 7   Harding was suffering from or has been suffering from, for
 8   example, persistent depressive disorder or unspecified anxiety
 9   disorder?
10              THE WITNESS:  We can objectively trace it back to
11   2010, that is the prior records are, he was prescribed
12   anti-anxiety and anti-depressive medication.
13              We can trace it to there, and it goes back further to
14   childhood, absent father, mother with mental health problems,
15   and so we could speculate there.  Objectively we could say 2010
16   with certainty.
17              THE COURT:  Okay.
18              MR. PEACOCK:  May I proceed?
19              THE COURT:  Yes.
20   BY MR. PEACOCK:
21   Q.  Dr. Harding, could you describe -- you described persistent
22   depressive disorder.  Could you describe the anxiety disorder,
23   and in particular, what unspecified means?
24   A.  Yes.  It doesn't cleanly fit into one category, he has
25   anxiety and panic disorder.  He has a number of different
```

1    anxiety and conditions, it is a collection.

2         He has had anxiety for awhile, and psychological testing

3    does show anxiety symptoms.  This again is a condition in which

4    a person feels higher levels of stress, tension or worry than

5    you ordinarily expect.  It isn't just because of someone facing

6    criminal prosecution or being put in jail, although certainly

7    that could be a factor, but he shows the symptoms prior to the

8    current legal problems and difficulties.

9         He reports this for a considerable period of time, prior to

10   2010, worry, distress, tension and etc.

11   Q.  Now, in regard to the post-traumatic stress disorder

12   symptoms, I know you said you didn't find enough to confirm a

13   full diagnosis.

14        Could you tell the Court what factors you did find that

15   could make post-traumatic stress disorder part of your

16   diagnoses?

17   A.  Sure.  On the MCMI-III, one of the tests I administered,

18   the first one I mentioned, a significant elevation on the post

19   traumatic stress scale.  He does report frequent thoughts,

20   recurrences and dreams back to the time of his sexual abuse as

21   a child by two individuals, and he does suggest at times he

22   feels overwhelming anxiety when things trigger or remind him of

23   those situations that occur to him at that time.

24        I couldn't give it as a full diagnosis because I couldn't

25   corroborate the events of the report.

1        There were other symptoms missing.  At least he reports

2    some of the symptoms, reactions that we expect that someone had

3    been abused during their childhood.

4    Q.  Let's move next to the panic disorder, and I ask the same

5    question.

6    A.  He reports periods where he feels overwhelmed by anxiety,

7    not to the point where he reports all of the symptoms necessary

8    in the DSM-5, panic disorder, but does report panic at times

9    that stops and interferes with daily activities.

10       There are suggestions he may have panic disorder, but does

11   not meet the full criteria, but we can't rule it out for

12   further diagnosis.

13   Q.  With regard to the alcohol use and marijuana use, let me

14   ask you this:  Did Mr. Harding report any abuse of prescription

15   drugs as well?

16   A.  Yes, sir, he did.

17   Q.  And do you know what those were, what type of drugs those

18   were?

19   A.  Yes, they were opioids or painkillers, they were prescribed

20   to him for a period of time, but he said he used them for a

21   short period of time in 2015.

22   Q.  Were you aware he was taking anti-psychotic medication as

23   well?

24   A.  The only medication I was aware he was taking was the

25   opioids and antidepressant and antiseizure medication often

```
1    used for anxiety.
2    Q.  My anti-psychotic term may be inaccurate.  Would
3    psychoactive be --
4    A.  Psychotropic medication.
5        He received the diagnosis by a psychiatrist, that is the
6    psychotropic medication he was receiving.
7    Q.  He was receiving Klonopin and Zoloft?
8    A.  Correct.
9    Q.  Now, the combination of these drugs, along with the alcohol
10   and marijuana abuse, would that have any effect on his -- on
11   your diagnosis of him?
12   A.  Well, certainly, yes, that contributed to the diagnosis I
13   gave him.
14       He said he was not using the opioids and medication, but
15   still using alcohol and marijuana at the time of the offense,
16   at the time of the arrest, actually.  Those conditions would be
17   relative to diagnosis, that is why I listed them in my
18   criteria.
19   Q.  You reported to his incidents of sexual abuse as a child.
20       What, if any, part would they play in your diagnosis?
21   A.  Well, he does report multiple incidents as a child of
22   sexual abuse.  Those could be the symptoms of post-traumatic
23   stress, the elevations of the MCMI, which looks like
24   post-traumatic stress, recurrent thoughts and dreams, those are
25   consistent with someone sexually abused, especially if he
```

1    hasn't relayed that information, he kept it to himself.

2    Q.  Are you aware that the offense which he has been charged

3    and convicted of involves child pornography?

4    A.  Yes, I am.

5    Q.  And allegations of child sexual abuse as well?

6    A.  Yes, I am aware of that.

7    Q.  Do you see any connection between his prior child abuse and

8    the offenses which I just mentioned?

9    A.  I can only speak generally about that.  I did not ask him

10   about the offense.

11       I can say individuals that have been sexually abused are

12   over represented in regard to the individuals who view child

13   pornography, a larger percentage of those have gone through

14   aberrant sexual behavior in their childhood themselves.

15   Q.  Now, are you familiar -- do you have expertise in clinical

16   research and evaluation of sex offenders?

17   A.  Yes, I do.

18   Q.  And in particular, those who are accused and convicted of

19   sex offenses against children?

20   A.  Yes, sir, I do.

21   Q.  Now, could you explain to the Court what the progress of

22   dangerousness to the community is as an individual grows older,

23   in particular child sex offenders?

24   A.  We know that age is a relevant factor, one of the most

25   salient factors in the research in regards to frequency of

1   probability of someone engaging in sexually violent or abusive

2   behaviors.

3      We know if individuals achieve a certain age, there is a

4   graphic drop off in recurrence or recidivism of those

5   behaviors.  We know that age is about the age of 55.

6      So, there is a term for it called desistence.  The only --

7   that is not just for sex crimes, but in particular sex crimes,

8   we know that individuals usually were younger, between the ages

9   of 18 and 30, but there is research that says 18 to 30 have the

10  highest incident, and those drop off at 55, have lower rates.

11     The only exception is if a person has anti-social

12  personality disorder or psychopathic personality disorder, with

13  a long criminal history of violations.

14     If we see those infringements, a -- there is no diagnosis

15  of that.  We expect in this case, if you look at the clinical

16  research, desistence would be a factor here and the probability

17  lower.  It would be descending behavior after the age of 55.

18         MR. PEACOCK:  Thank you.  That is all I have, Your

19  Honor.

20         THE COURT:  Okay.  Cross-examination.

21                     **CROSS-EXAMINATION**

22  BY MR. FUNK:

23  Q.  Good morning, Dr. Brannon.

24  A.  Good morning.

25  Q.  When you completed your report in December of 2015, were

1   you provided by Mr. Peacock with the charging document in this

2   case?

3   A.  I had the criminal complaint, which is what I reviewed

4   earlier on, and I had discussions with Mr. Peacock about other

5   allegations.

6   Q.  In your report, you do not note that the Defendant was

7   charged with attempted enticement of a child; is that correct?

8   A.  Yes, sir, that is correct.

9   Q.  You do not note in your report that the Defendant was

10  charged with production of child pornography?

11  A.  Correct.

12  Q.  Are you aware of the facts underlying the enticement

13  charge?

14  A.  Yes, sir.  I sat through the Court's last hearing in this

15  matter, and I spoke to Mr. Peacock previously.

16  Q.  At the time you first knew about the enticement, the

17  information did not come from the chat messages that are a part

18  of the case?

19  A.  That is correct, I was not asked to do anything with the

20  charges, risk assessment, I was not asked about those areas.

21  Q.  You are giving your opinion whether or not the Defendant is

22  engaged in a behavior that a pedophile would behave in,

23  correct?

24  A.  Yes, sir.

25  Q.  And part of the facts that you could use to support your

Pauline A. Stipes, Official Federal Reporter

1    assessment would be chat messages that the Defendant engaged

2    with other people regarding explicit sexual conversations

3    involving children?

4    A.  Yes, sir, that is correct.

5    Q.  And you didn't request from Mr. Peacock to look at those

6    chat messages?

7    A.  No, I was not asked to look in that area.  I was asked to

8    do a risk assessment, but I wasn't asked to do that.

9    Q.  So, given an assessment of whether or not individuals would

10   offend at 55 years of age, that is a general opinion about

11   offenders in general, correct?

12   A.  Yes, that is correct.

13   Q.  It does not necessarily apply to Mr. Harding?

14   A.  Well, he didn't ask me about the fact patterns, I couldn't

15   apply it to him.

16   Q.  Would the severity of the abuse of pornography have an

17   effect on whether someone would reoffend?

18   A.  Not the amount.  No clinical research says the amount

19   increases or decreases the risk.  The content does, but the

20   amount does not.

21   Q.  What kind of content would be more aggravating or probable

22   of having someone offend?

23   A.  Younger children, kids under the age of five, kids who had

24   been abused in any way, or bondage, kids with animals.

25   Q.  What is the diagnosis criteria for pedophiles?

1    *A.*   Primarily an interest in prepubescent children, and

2    additional factors that changed in the DSM-5.

3         The required diagnosis in the DSM-4 requires some sort of

4    touch, the DSM-5 does not, only requires significant

5    interference in a person's life as a result of that primary

6    sexual attraction to prepubescent.

7    *Q.*   Would a statement, I like girls 5 to 12, in regards to him

8    be a pedophile?

9    *A.*   It could be, if it is primarily in prepubescent children,

10   pornography looked at and saved, put in subdirectories, if the

11   information is the prepubescent children, then likely the

12   diagnosis would fit.

13   *Q.*   Would an abuse of an individual between the ages of five to

14   nine be a pedophile?

15   *A.*   It would be one of the diagnostic criteria, yes.

16   *Q.*   With hands-on response, would you agree he would reoffend?

17   *A.*   Any time there is a contact offense, that increases future

18   abuse.

19   *Q.*   Would his offer to exchange his stepchild with an

20   individual on line in order to have sex with the child of the

21   other person, would that be an indicator of a greater

22   probability of him offending in the future?

23   *A.*   Yes, it would.

24   *Q.*   Would his encouraging other people to produce child

25   pornography be an indicator of risk of future offending?

1   *A.*   In general, any contact, specific -- any contact with any

2   person about child pornography increases risk.

3   *Q.*   Would the fact of 95 percent of the pornography that he had

4   on his electronic devices being child pornography, would that

5   be an indicator him being a pedophile?

6   *A.*   Yes.   Not that alone, but other factors to that yes.

7   *Q.*   Would the quantity or proportion of the pornography being

8   child pornography, would that be a greater risk of future

9   offending?

10   *A.*   Yes, if it is prepubescent children, yes.

11   *Q.*   And if it includes sadistic behavior, would that be an

12   indicator of future offending?

13   *A.*   Yes.

14   *Q.*   Did you consider evaluating the defendant for anti-social

15   personality disorder?

16   *A.*   I did.   The scales on the MCMI are designed for that

17   measure of personality, for anti-social personality disorder.

18       Also, his reported history is not consistent with

19   anti-social personality disorder.

20   *Q.*   Do you include just the inventory -- excuse me, do you just

21   include those tests in your evaluation or do you look to other

22   evidence to base your opinion?

23   *A.*   Other evidence as well.

24       I spoke to his mom and got the prior treatment records.

25   *Q.*   Did you ever speak to his wife?

1    A.  I did not.

2    Q.  Did you ever make an attempt to speak to his wife?

3    A.  I did not.

4    Q.  Would the fact that she lived with him on a full-time basis

5    give her a better understanding of his psychological state than

6    his mother?

7    A.  I can't answer that without having spoken to her.  I can't

8    answer her -- I don't know.  His mother would know him longer

9    and have more of a history of him.  She seemed to have pretty

10   good judgment of his behavior.

11   Q.  Do you know when his mother stopped living -- when the

12   Defendant stopped living with his mother?

13   A.  I do not.

14   Q.  Did you speak with his employer?

15   A.  I did not.

16   Q.  Did you administer any tests that would evaluate for

17   pedophilia?

18   A.  There is no test that would assess pedophilia, but there

19   are fact patterns.  If you are doing that type of assessment

20   you could look at them, many of which you mentioned, that would

21   help you arrive or form that diagnosis.

22   Q.  Did you look at the PCA's, probable cause affidavits, for

23   the hands-on offending?

24   A.  No, only the criminal complaint which I mentioned to you.

25   Q.  Is one of the criteria of an anti-social personality an

Pauline A. Stipes, Official Federal Reporter

1    impairment in self functioning?

2    *A.*  Yes, that is one of the many criteria, yes.

3    *Q.*  Does it include self direction, goal setting based on

4    personal gratification, absence of pro social internal

5    standards associated with failure to conform to lawful cultural

6    normative ethical behavior?

7    *A.*  Yes.

8    *Q.*  Would the victimizing of prepubescent children for the

9    purpose of personal gratification be a violation of lawful or

10   cultural normative ethical behavior?

11   *A.*  Yes.

12   *Q.*  In the absence of pro social internal standards, would that

13   be evidenced by his conversations with other people in lacking

14   any empathy for the pain of the child that he is abusing?

15   *A.*  I didn't ask him specifically about that.

16       I guess the factor that he had been married for a period of

17   time and residing with his wife would be pro social behavior.

18   Without further speaking to those things that you mentioned, I

19   could not respond to that.

20   *Q.*  Would it be goal settings based on personal gratification

21   if you were to arrange a meeting with someone in another city

22   in order to swap children for sexual abuse?

23   *A.*  Hum, yes.

24   *Q.*  Would it be -- do people that have anti-social

25   personalities, do they lie to other people in order to carry

 1   out their own goals?

 2   A.   They are generally lying, being lying generally would be

 3   one of the criteria.

 4   Q.   The second criteria for the anti-social personality is that

 5   they lack empathy -- have a lack of concern for feelings, needs

 6   or suffering for others, lack of remorse after hurting or

 7   mistreating another person; is that correct?

 8   A.   Yes.

 9   Q.   Would a statement regarding -- would the absence of any

10   concern of the physical harm to a victim be an indication of

11   the lack of concern of feelings, need or suffering of others?

12   A.   Not necessarily.  You need a constant pattern of that

13   throughout the course of your life.

14       That diagnosis requires a diagnosis of conduct disorder by

15   the age of 15.  Any one incident or a couple of incidents

16   wouldn't necessarily be that.  It would be a lifetime pattern

17   of those behaviors.

18   Q.   Would a pattern of over four years be taken into

19   consideration?

20   A.   Yes, absolutely.

21   Q.   If there were multiple events in which a child was harmed

22   by the Defendant over a period of four years, would that be a

23   factor that would contribute to a diagnosis of anti-social

24   personality?

25   A.   Well, it would start before the age of 15.  You have to see

1    patterns of behavior consistent with what you are talking about

2    before the age of 15.  All of these things are anti-social and

3    problematic behavior, but in order to get the full diagnosis

4    you need a life-long pattern of disruptive school behavior,

5    infractions, that go on for a period of time.

6    Q.  Would those type of behaviors contribute to the risk of

7    someone reoffending throughout the course of their life?

8    A.  Yes.

9    Q.  What is the concept of co-morbidity?

10   A.  Well, the factors you are looking at with regard to risk

11   behavior, more probability of working out -- reoffending.

12   Q.  Does a victim of child sexual abuse necessarily commit

13   child sexual abuse when they become older?

14   A.  No.

15   Q.  Does a person who is depressed necessarily commit child

16   sexual abuse?

17   A.  No.

18   Q.  Does a person who is anxious or has anxiety disorder

19   necessarily commit child sexual abuse?

20   A.  No.  Those factors just increase probabilities, they are

21   not a guarantee that a person will behave in any specific way.

22   Q.  Was there any indication that the Defendant had the

23   incapacity to understand the criminal nature of his behavior?

24   A.  No.

25   Q.  Would the fact that he is chatting with other people online

1    talking about how other people got caught for what he was

2    doing, would that be an indication that he understood the

3    criminal nature of his offense?

4    *A.*   Yes.

5    *Q.*   One of the conclusions that you came to in the end of your

6    report is that you -- the use of alcohol -- let me read it for

7    you.

8        "Moreover, the examinee's apparent addictions to marijuana,

9    alcohol and pornography likely impaired his judgment and

10   ability to control his impulses at the time of the alleged

11   offenses."

12       Do you have a copy of your report?

13   *A.*   Yes.

14   *Q.*   Is there any place you refer to the pornography as child

15   pornography?

16   *A.*   No.   That is not what he reported.   He reported he went to

17   counseling in 2010 for addiction to adult pornography.   That is

18   what I was referencing.

19   *Q.*   You informed him the examination was for mitigation at

20   sentencing?

21   *A.*   Correct.

22   *Q.*   Are you trying to say in your report that alcohol use or

23   marijuana was going on at the time he committed these offenses?

24   *A.*   Only that he reports he was using those substances during

25   the period of time in which the allegations occurred, in which

Pauline A. Stipes, Official Federal Reporter

1    the events of the behavior occurred.

2        We know using alcohol causes poor judgment, difficulty with

3    reasoning.  Based on that self-induced condition he put himself

4    in for that period of time, certainly that could be a factor

5    whether or not he engaged in behavior to violate the law.

6    Q.  Were you aware he was transmitting child pornography while

7    he was on duty as a law enforcement officer?

8    A.  I did know that was an allegation, he was employed as a

9    officer at the time of the arrest.

10   Q.  Do you know of any difficulties he had with his employment?

11   A.  I didn't check on that, but he didn't report any.

12   Q.  Do you know of any instances while he was employed where it

13   was reported that he was using alcohol or using marijuana?

14   A.  Again, I didn't have those records.  He didn't report any

15   disciplinary action as a result of that.

16        MR. FUNK:  Just one moment, Doctor, sorry.

17        THE WITNESS:  Yes, sir.

18   BY MR. FUNK:

19   Q.  Do you agree in the course of this examination the

20   Defendant had a motive to be dishonest?

21   A.  Yes.  There was no indication of it, but anybody in a

22   sentencing setting has a motive to avoid a punitive sentence.

23   Q.  Do you know if the defendant was employed -- before the

24   employment with law enforcement agencies, was he given

25   psychological examinations prior to employment?

 1    *A.*  I know, yes, in order to be a police officer, he would have

 2    to have pre-examination, and that included psychological

 3    testing.

 4              *MR. FUNK:*  Your Honor, that is all I have.  Thank you.

 5              *THE COURT:*  Okay.  Does that conclude this witness?

 6              *MR. PEACOCK:*  Judge, I have a few questions.

 7              *THE COURT:*  Okay.

 8                          **REDIRECT EXAMINATION**

 9    *BY MR. PEACOCK*:

10    *Q.*  Dr. Brannon, Fletcher Peacock again.

11    *A.*  Yes.

12    *Q.*  We talked about risk.

13        Is it safe to say a risk assessment at this time would not

14    be good for Mr. Harding given the factors that you know about

15    the case?

16    *A.*  Yes, and all the factors the Government mentioned.

17        No, it is not favorable if it were conducted now.

18    *Q.*  Do you still maintain that once Michael Harding reaches the

19    age of 50 or 55, his risk will fall way off statistically?

20    *A.*  Well, I can speak in general and say individuals who have

21    not been diagnosed with psychopathic or anti-social

22    personality, those individuals have a great drop off in terms

23    of re-offensive behaviors in general, especially sexual abuse

24    over the age of 55.

25    *Q.*  Now, Mr. Funk asked you about anti-social personality

1    disorder.

2        Did you consider that in your testing?

3    A.  Very much so.  It's a very important variable diagnosis,

4    that is one of the reasons why I chose the tests I did.  I do

5    look for that in all evaluations as it would be a factor in

6    which the treatment would be assessed in the future.

7    Q.  Based on your testing, did you rule that out?

8    A.  Not just testing.  Yes, I did rule that out.  He does not

9    meet the full criteria for that condition.

10   Q.  In fact, many of the things that he demonstrates show a

11   great comportment with societal norms, correct?

12   A.  Yes, he shows behaviors that are pro social at times.  The

13   fact that he is involved in relationships, maintained jobs, and

14   not violate societal rules from the point of being arrested,

15   those kind of things argue strongly against anti-social

16   personality disorder.

17   Q.  How about the fact of completing college?

18   A.  Less so, but that certainly can be a factor in terms he

19   maintained following rules and regulations, and was responsible

20   enough to complete that college, yes.

21   Q.  And how about the fact of being a police officer and being

22   awarded Officer of the Year?

23   A.  Sure, not violating any rules or having disciplinary

24   reactions that he related to me and being removed from the

25   force, that would be important.

1    Usually people in that position are frequent rule breakers

2    and come to their attention frequently.

3    *Q.*  Last, once again, the self reporting of prior sexual abuse

4    by Mr. Harding, is it safe to say that statistically

5    individuals who self report child abuse are statistically more

6    likely to be abusers in the future?

7    *A.*  Yes.  We know perpetrators -- there is a higher percentage

8    of individuals who have been abused and some sexual behavior

9    occurred to them, we know it is a risk factor.

10    We do not mean that all people abused abuse themselves, but

11    it is a likelihood they will abuse someone else.

12    *Q.*  Are you still confident in your diagnosis considering all

13    of the questions on cross-examination?

14    *A.*  Yes.

15         *MR. PEACOCK:*  Thank you.

16         *THE COURT:*  Thank you, Dr. Brannon.

17         *THE WITNESS:*  Thank you, Your Honor.

18         *THE COURT:*  Okay.

19         Now, do we want to go back to Special Agent Rey?

20         *MR. FUNK:*  Yes.

21         *THE COURT:*  Okay, we have a half hour on direct.

22         *MR. PEACOCK:*  Your Honor, may I inquire what the

23    Court's schedule will be, roughly?

24         *THE COURT:*  Well, whatever time it takes to get

25    through the sentencing.

```
1              MR. PEACOCK:  I didn't know what time you were going
2    to break for lunch.
3              THE COURT:  No, I haven't thought about that yet.  I
4    would like to do it in a time that is convenient, not breaking
5    up a witness.
6              I know we have the rest of Special Agent Rey, and we
7    have Mrs. Harding.
8              Maybe at least those two witnesses, that might bring
9    us to the lunch hour.
10             MR. PEACOCK:  I just need to step out and make phone
11   calls at some point.
12             THE COURT:  All right.  Just keep me apprized.
13             Okay, we have Special Agent Rey back on the stand for
14   direct continuation.
15                      DIRECT EXAMINATION continued
16   BY MR. FUNK:
17   Q.  What is Drop Box?
18   A.  It is a service that is designed to share files.
19   Q.  How does one share files on Drop Box?
20   A.  A couple of different ways; one, they provide a use of Drop
21   Box, an account user provides access to files they uploaded to
22   the service.  In that way, they can share files by sending
23   direct links to a particular file.
24   Q.  Were there indications in your forensic examination that
25   the Defendant had been using Drop Box in order to view child
```

1   pornography?

2   A.   Yes.

3   Q.   Did you see any indication in your examination as to

4   whether or not the Defendant was organizing his collection of

5   child pornography?

6           THE COURT:   I am sorry, did we re-swear the witness?

7           If not, why don't we do that.

8           BRIAN REY, GOVERNMENT'S WITNESS, SWORN

9           THE COURT:   Thank you very much.

10          MR. FUNK:   Thank you.

11  BY MR. FUNK:

12  Q.   Was there any indication, Agent, whether or not the

13  Defendant was organizing or cataloging images of child

14  pornography?

15  A.   Yes.

16  Q.   What did that appear to be from your examination?

17  A.   On the PNY phone drive, he had a folder structure where he

18  was keeping his child pornography.

19  Q.   Did he have a folder structure as well on the LGD 800 cell

20  phone?

21  A.   Not that I remember recalling, no.

22  Q.   Was there a path or folder that was created entitled Kik

23  videos?

24  A.   Yes.

25  Q.   Where was that created?

1    *A.*  On the LG 800.

2              *THE COURT:*  That is the phone?

3              *THE WITNESS:*  Yes, ma'am.

4    *BY MR. FUNK:*

5    *Q.*  Was it Kik that he posted the videos on?  Was it on that

6    application on that chat site?

7    *A.*  It was.

8    *Q.*  Is that naming convention for that path created by the

9    phone or something the Defendant would have needed to create

10   himself?

11   *A.*  It would have been a user created folder.

12   *Q.*  During one of the chat conversations with another

13   individual, does the Defendant indicate he made attempts, or he

14   had a desire to attempt to retrieve the video he made with

15   C.W.?

16   *A.*  Yes, that is one of the chats.

17   *Q.*  Is there some indication independent of that statement

18   whether or not the Defendant took acts to retrieve the video?

19   *A.*  I did find a thumbnail image that appeared to be from a

20   video instructing people how to recover deleted video files.

21   *Q.*  Have you prepared a compact disk which includes images that

22   you found on the electronic devices that were in the possession

23   of the Defendant?

24   *A.*  Yes, sir.

25             *MR. FUNK:*  Your Honor, if I could have Agent Rey step

Pauline A. Stipes, Official Federal Reporter

1    down, please.

2              THE COURT:  Yes, he may.

3              MR. FUNK:  Your Honor, the exhibit we are going to

4    present is 11.

5              THE COURT:  The DVD.  Is there going to be any

6    objection to Exhibit 11?  Has counsel seen it?

7              MR. PEACOCK:  I have not reviewed it.

8              I have gotten discovery, and I have had discovery

9    conferences.  I will stand here.

10             THE COURT:  We are discussing it now and it's marked

11   now.  Let me know when you are ready to move it into evidence

12   and I will see if there is any objection.

13   BY MR. FUNK:

14   Q.  How did you compile the images contained in the CD?

15   A.  I reviewed child exploitation material on the Defendant's

16   digital media with counsel to select some demonstrative images

17   on the video.

18             MR. FUNK:  Your Honor, for the record, we have turned

19   all the monitors towards the Court so the gallery cannot view

20   the images.

21             The videos will come up, the only people that will see

22   the images are the people in front of the counsel table.

23             THE COURT:  Lakeshia, do you have it on the setting

24   that wouldn't show it on the large screen?

25             THE COURTROOM DEPUTY:  Judge, the television is off.

```
 1            THE COURT:  All that would show is the Court's desk
 2   and counsel's computers which are facing the Court, not facing
 3   counsel or anyone here in the courtroom.
 4            So, does counsel want to acknowledge that?  Mr.
 5   Peacock, is that how you see the monitors, it is facing you and
 6   not toward the back of the courtroom?
 7            MR. PEACOCK:  Yes.
 8            THE COURT:  Mr. Killinger and Mr. Funk?
 9            MR. KILLINGER:  Yes.
10            THE COURT:  You may prepare the images as
11   demonstrative.  Are you seeking to admit them?
12            MR. FUNK:  I will offer what is marked Government
13   Exhibit 11.
14            THE COURT:  Mr. Peacock, do you still need to see them
15   before you agree or disagree as to the admission?
16            MR. PEACOCK:  I don't think I will have an objection,
17   but I have not looked at that.
18            THE COURT:  You may show the image.  I think it will
19   show up on the monitor for the Court.
20            MR. FUNK:  There are different images as well as
21   videos.  There is a description in the witness list, and they
22   have been marked Exhibit 11-A through 11-L -- I'm sorry, 11-M.
23            THE COURT:  You will indicate when you are showing
24   which one?
25            MR. FUNK:  Yes, Your Honor.  They are in the order in
```

1    which they appear on the compact disk.

2            THE COURT:  Okay, I see that.

3            MR. FUNK:  We will put it up on the screen as a test

4    to make sure it does not show in the gallery.

5            THE COURT:  All right.  That is a good idea.

6            MR. FUNK:  This is for the Court's review of the

7    evidence.  If you indicate to us the images, when we should

8    move on to the next one, we will move on.

9            THE COURT:  All right.

10           MR. FUNK:  There is one video where we would like the

11   Court to view the last part.  It is a brief period, it is

12   actually not the pornography, it is a credit that is part of

13   the video image.

14           THE COURT:  Okay.

15           MR. FUNK:  I don't see anything on the monitors at

16   this time.

17           THE COURT:  Is that linked to the ELMO.

18           MR. FUNK:  It is not the ELMO.

19           THE COURTROOM DEPUTY:  It was the P.C.

20           THE COURT:  That is what we were using with the ELMO.

21   Have we tried it with a computer before?

22           THE COURTROOM DEPUTY:  No.

23           MR. FUNK:  We will try connecting it to the ELMO.

24           THE COURTROOM DEPUTY:  Try the prosecution P.C.

25           MR. FUNK:  Agent Rey's desktop should appear now.

41

1            *THE COURT:*  Should we bring the computer up?

2            I can come down.

3            *MR. FUNK:*  Your Honor, we'll look first at what is

4      obtained from the PNY USB drive.

5            The first exhibit for publication is 11-A.

6            *THE COURT:*  Okay.

7            *MR. FUNK:*  It is titled underscore 0110, that is the

8      beginning of the title for the image.

9            *THE COURT:*  And this was found on the Defendant's PNY

10     USB drive; is that right?

11           *THE WITNESS:*  Yes, ma'am.

12           *THE COURT:*  This is something you received from

13     someone else?

14           *THE WITNESS:*  The PNY drive was recovered from the

15     search of the Defendant's home.

16           *THE COURT:*  This is not one of C.W. or the other

17     stepdaughter.

18            Is this something he took or received, or don't you

19     know?

20           *THE WITNESS:*  It would be something he received.

21     *BY MR. FUNK:*

22     *Q.*  The PNY USB drive was located in the closet in the gun

23     case; is that correct?

24     *A.*  That is correct.

25     *Q.*  The next image is 11-B, a video titled Eye of the Tiger.

Pauline A. Stipes, Official Federal Reporter

42

```
 1         (Thereupon, the video was played.)
 2              MR. FUNK:  We will skip to the end.  We can go to the
 3    credits.
 4    BY MR. FUNK:
 5    Q.  The reference in the credits at the end to April and
 6    Mastodon, what is that referring to?
 7    A.  That is how the creator of this particular series referred
 8    to himself and his victim.
 9    Q.  Is there a reference in chat messages to April and
10    Mastodon?
11    A.  There are specific references to Mastodon, yes.
12    Q.  The next image, 11-C, is titled Fan Service.
13         (Thereupon, the video was played.)
14              THE WITNESS:  If you would like me to skip to the end.
15              THE COURT:  Okay.
16    BY MR. FUNK:
17    Q.  Is there a credit on the end of that as well?
18    A.  Yes, sir.
19    Q.  What is the credit?  If you'd skip to that.
20    A.  It should be coming up in a few seconds here.
21         (Thereupon, the video was played.)
22    BY MR. FUNK:
23    Q.  We are looking at a credit to all our fans, Mastodon and
24    April.  Is that the same credit that was in the Eye of the
25    Tiger?
```

1    *A.*  It refers to the same individuals, yes.  This is from an

2    identified series where the offender was apprehended and the

3    victim identified.

4    *Q.*  The next one is tarapurple, a video.

5          *MR. PEACOCK:*  I object to the relevance, it is

6    cumulative.

7          *THE COURT:*  I will let you respond.

8          *MR. FUNK:*  This image, the video represents sadistic

9    behavior on the part of the Defendant.  This is one of the

10   offense characteristics the Court needs to take into

11   consideration.

12         *MR. PEACOCK:*  That is not challenged, that enhancement

13   has not been challenged.  I haven't had a child pornography

14   case where it didn't exist.

15         *MR. FUNK:*  It's not merely providing a factual basis

16   for the offense characteristics, it is the totality of the

17   circumstances for what is an appropriate sentence, and we have

18   a doctor who says sadistic images contribute to the future risk

19   of reoffending.

20         The Court should view it.  You have the ability to

21   stop it at some point in time.

22         *THE COURT:*  I will overrule the objection.

23         *THE WITNESS:*  Mr. Funk, we talked about going to the

24   demonstrating of the sadistic --

25         *MR. FUNK:*  Yes.  May it please the Court, there is a

1    portion that represents the sadistic nature of the acts.

2              THE COURT:  Okay.

3              (Thereupon the video was played.)

4              THE COURT:  Okay.

5              MR. FUNK:  The next image is 11-E, prepubescent female

6    and adult male.

7              THE COURT:  This is found on the phone versus the USB

8    drive?

9              MR. FUNK:  That is correct.  Agent.

10             THE WITNESS:  I am trying to get to the image you are

11   referring to.  We move on to the LG 800.

12             MR. PEACOCK:  Objection, same objection, cumulative,

13   not relevant.  The Government established the enhancements, it

14   is just prejudicial.  That is all it is at this point.

15             THE COURT:  The Court will overrule the objection.

16             THE WITNESS:  I'm sorry, which --

17             MR. FUNK:  11-E is a video of prepubescent female with

18   adult male, one minute and 11 seconds long.

19             (Thereupon, the video was played.)

20             THE WITNESS:  Mr. Funk, do you want me to skip to the

21   end of this one?

22             (Video continued.)

23   BY MR. FUNK:

24   Q.  The next image is 11-F, labeled CAM 00209.

25       Can you explain what that is an image of, Agent?

1    *A.*  That is an image of Mr. Harding taking a picture of himself

2    and to Mr. Harding's right is child C.W.

3    *Q.*  Can you determine -- or were you able to determine what --

4    within the context of the chats, whether or not the cropped

5    portion of that image was ever transmitted to another

6    individual?

7    *A.*  Yes.

8    *Q.*  Who do you believe -- based on the chat images, who do you

9    believe that image or portion of it was sent to?

10   *A.*  To a subject who indicated his location was in Orlando.

11   *Q.*  Was that an individual who is a part of the factual basis

12   for the enticement chart?

13   *A.*  Yes, sir.

14   *Q.*  Was that entire photograph sent to that other person?

15   *A.*  No, sir.

16   *Q.*  We will show you 11-G.

17       Do you believe that to be the portion sent to the other

18   person in Orlando?

19   *A.*  Yes.

20   *Q.*  What reference was made by Mr. Harding to that image when

21   it was sent?

22   *A.*  He made reference to the individual telling the subject

23   that was his arm and C.W.'s -- I believe he referred to it as

24   sweet ass.

25   *Q.*  The next image to be published is 11-H.  We have it titled

```
 1    as Preteen Female Tied in Yellow Robe.

 2            THE COURT:  Okay.

 3    BY MR. FUNK:

 4    Q.  The next image is 11-I, what is that?

 5    A.  C.W. in a living type environment.

 6    Q.  Is it a pornographic image?

 7    A.  Yes.

 8    Q.  Do you believe that image was transmitted?

 9    A.  Yes, sir.

10    Q.  To whom?

11    A.  To the subject in Orlando with whom Mr. Harding was talking

12    about meeting and exchanging children.

13    Q.  The next image comes from the Samsung Galaxy cell phone,

14    11-J, video of a prepubescent female, oral sex on adult male.

15        (Thereupon, the video was played.)

16            THE COURT:  Mr. Peacock asked to turn it down.  You

17    can turn it down.  I can hear it.

18            (Thereupon,the video was played.)

19            MR. FUNK:  The next set of images come from those

20    posted by Michael Harding on the Kik account.

21            I will ask the agent.

22    BY MR. FUNK:

23    Q.  Where do these come from?

24    A.  These images were downloaded from our office in Wilmington.

25            THE COURT:  These are the ones posted by the
```

1    Defendant, the others were received by the Defendant?

2              THE WITNESS:  Yes.

3              THE COURT:  These were posted and shared with other

4    people?

5              THE WITNESS:  Yes.

6              THE COURT:  These are beginning with?

7         MR. FUNK:  11-K.

8              THE WITNESS:  Two images, this was the first.

9              THE COURT:  Now, is this the Defendant or something he

10   posted?

11             THE WITNESS:  This is not the Defendant.

12             THE COURT:  Okay.

13             THE WITNESS:  To be clear, the only one I have of the

14   Defendant was the one previously submitted.

15             MR. FUNK:  For the Court's reference, that is Exhibit

16   Number 9 that was physically printed out on a piece of paper.

17             THE COURT:  Okay.

18   BY MR. FUNK:

19   Q.  The next image is 11-L, one image posted on July 26, 2015;

20   is that correct, Agent.

21   A.  Yes, sir.

22             THE COURT:  Okay.

23   BY MR. FUNK

24   Q.  Next image, 11-M -- I apologize, 11-M, it is a video posted

25   to Kik on August 4, 2015; is that correct, Agent.

```
 1    A.   Yes.

 2         (Thereupon, the video was played.)

 3              THE COURT:  Okay.

 4              MR. FUNK:  That will conclude the presentation of the

 5    images contained on Exhibit 11.

 6              THE COURT:  Okay.

 7              Okay, you may proceed.

 8    BY MR. FUNK:

 9    Q.   Agent, were you able to find a list of Kik chat rooms

10    joined by Michael Harding?

11              THE COURT:  I am sorry, Exhibit 11 -- over some

12    objections to relevancy and cumulative, the Court will admit

13    11, which contains all of the subparts.

14         (Whereupon Government Exhibit 11 was marked for evidence.)

15              MR. FUNK:  May I proceed, Your Honor?

16              THE COURT:  Yes.

17    BY MR. FUNK:

18    Q.   Were you able to recover a list of chat rooms that were

19    joined by Michael Harding?

20    A.   Yes.

21    Q.   Did you complete a printout of those chat rooms?

22    A.   Yes, sir.

23              MR. FUNK:  Your Honor, I will show defense counsel

24    what is marked Government Exhibit 12.

25              May I approach the witness?
```

1        *THE COURT:* Yes.

2   *BY MR. FUNK:*

3   *Q.* Agent, I am showing you Government Exhibit 12. Do you

4   recognize what that is?

5   *A.* Yes.

6   *Q.* What is it?

7   *A.* That is a printout of chat rooms in the Kik application, an

8   indication that Mr. Harding had joined those chat rooms.

9   *Q.* Do you know how that is created on the phone?

10  *A.* It's created by the application Kik and the particular

11  artifact that showed me that they were chat rooms joined that

12  were sent when the user joined the room.

13  *Q.* Do you know if that represents all of the chat rooms he

14  joined or a list that remained on the phone? Could you explain

15  that?

16  *A.* Most of the data indicated to Kik is not retained by the

17  device, it has no use to retain data of this nature.  I

18  recovered a lot of it from areas in which the phone had been

19  deleted.

20      This particular list goes back to August 5, 2015, and it is

21  not a complete list because the room he was in when he posted

22  the child pornography is not included in this list.

23  *Q.* What was the name of the Kik room he was in at the time he

24  posted child pornography?

25  *A.* Hash tag Toddler Fuck.

```
1              MR. FUNK:  Your Honor, at this time I move into
2    evidence what is marked Government Exhibit 12.
3              MR. PEACOCK:  No objection, Your Honor.
4              THE COURT:  All right.  12 is admitted without
5    objection.
6              Is this what was filed under seal already or not?
7              MR. FUNK:  I believe the motion was filed to seal it.
8              THE COURT:  But all the attachments were --
9              MR. FUNK:  It has not been filed.
10             MR. PEACOCK:  12 needs to be sealed, Your Honor.
11             THE COURT:  Well, the Court viewed a number of -- all
12   of the chats that were -- something was filed.
13             MR. FUNK:  It was.
14             THE COURT:  That is different from what we are talking
15   about now?
16             MR. FUNK:  If I could have the agent explain the
17   difference.
18             THE COURT:  When I say something was filed, let me
19   find the docket entry.
20             Yes, Docket Entry 91, which was docketed May 11th.
21             There is a motion to seal the exhibit and the attached
22   exhibit establishes facts alleged in the PSI.  The exhibit is
23   being filed in support of the sentencing memo.
24             In any event, it goes on, sealed exhibit and it begins
25   with something called extraction report and all of the
```

1     conversation, instant messages.

2          There are 154, at least on the first one.  Maybe each

3     one has its own number.

4          Yes, the next conversation is 64, and goes on, I think

5     eight pages or so.

6          MR. FUNK:  Correct.

7          THE COURT:  Is that different from what we are talking

8     about in Exhibit 12 or the same thing?

9          THE WITNESS:  That is different.  Exhibit 12 are the

10    rooms which I was able to recover that the Defendant entered

11    within the Kik application, and the name suggests -- those are

12    the actual messages going back and forth between the parties,

13    what you have there.

14         THE COURT:  All right.

15         MR. FUNK:  I don't know whether Your Honor admitted

16    Exhibit 12.

17         THE COURT:  Yes, admitted without objection.

18       (Whereupon Government Exhibit 12 was marked for evidence.)

19    BY MR. FUNK:

20    Q.  Agent, what does that represent?

21    A.  Those were the titles of the chat rooms joined by the

22    Defendant, only the ones I was able to recover.

23    Q.  Are there entries included there, are they a product of the

24    Defendant selecting those chat rooms to join?

25    A.  Yes.

1    *Q.*  What are the titles of the chat rooms that he joined or

2    attempted to join?

3    *A.*  Starting at the top -- all of these are preceded by a hash

4    tag, I will eliminate that.  Daddy 6, daddydaycarenude,

5    yungtightpussy, justtradenotalk, littleweenie, lilsults,

6    kinderporno3, kidvids and torpedo1.

7    *Q.*  Did you also in your examination of the LG D800 phone find

8    a cache of memes that were entitled pedobear?

9    *A.*  Yes.

10   *Q.*  What is a cache, and what are memes?

11   *A.*  The current use of the word meme refers to an image which

12   is circulated around the community on the internet, often with

13   attached wording, intended to be humorous.

14   *Q.*  What does cache mean?

15   *A.*  Cache would be an area where images or data is stored

16   temporarily by the operating system, the device that is being

17   used.

18   *Q.*  Does that necessarily mean it was downloaded or just that

19   it was viewed?

20   *A.*  It means that it is viewed.

21       Technically, it has to be downloaded so that it was on the

22   device, but does not mean it was intentionally saved.

23           *MR. FUNK:*  Your Honor, I show defense counsel what is

24   Exhibit 13.

25           *THE COURT:*  Okay.

Pauline A. Stipes, Official Federal Reporter

1              *MR. FUNK:*  May I approach the witness?

2              *THE COURT:*  Yes.

3    BY MR. FUNK:

4    Q.  Agent, I am showing you what is marked Government Exhibit

5    13.  Do you recognize what that is?

6    A.  Yes, sir.

7    Q.  What is it?

8    A.  It is a printout of the Pedobear images recovered from the

9    LG phone.

10              *MR. FUNK:*  I move in 13.

11              *THE COURT:*  Any objection?

12              *MR. PEACOCK:*  No.

13              *THE COURT:*  Admitted.

14        (Whereupon Government Exhibit 13 was marked for evidence.)

15              *MR. FUNK:*  Your Honor, for publication, I would ask

16   you to read what is on the document rather than reading it out

17   loud.

18              *THE COURT:*  Okay.

19   BY MR. FUNK:

20   Q.  In the chat messages that were provided, can you outline

21   approximately how many chats were on the phone and how many

22   were printed out into an extraction report?

23   A.  Off the top of my head, I believe over 130 chats that I was

24   able to recover from the phone.  There were, I believe, 78

25   chats that I bookmarked for inclusion in the computer forensic

1   report.

2   *Q.*  Did the Defendant proclaim an interest in the prepubescent

3   children in the chat room with other individuals?

4   *A.*  Yes.

5           *MR. FUNK:*  That is all I have, thank you.

6           *THE COURT:*  Okay.  Cross-examination.

7           *MR. FUNK:*  Your Honor, if I might, I apologize.

8           When we were here last, we made reference to the chat

9   conversation under seal.  We intended to mark them Exhibit 10.

10          I offer that into evidence for the record at this

11  time.

12          *THE COURT:*  Any objection?

13          *MR. PEACOCK:*  No, ma'am.

14          *THE COURT:*  10 is admitted without objection.

15      (Whereupon Government Exhibit 10 was marked for evidence.)

16          *MR. PEACOCK:*  No questions, Your Honor.

17          *THE COURT:*  All right.  Thank you very much.  You can

18  step down.

19          We will take a 15 minute break and we will be back a

20  few minutes after 11:00 o'clock.

21          (Thereupon, a brief recess was taken.)

22          *THE COURT:*  You may be seated.

23          Government, ready to call your next witness?

24          *MR. KILLINGER:*  The Government calls Ashley Harding.

25          ASHLEY HARDING, GOVERNMENT'S WITNESS, SWORN

 1           *THE COURTROOM DEPUTY:*  State your name and spell your
 2     last name.
 3           *THE WITNESS:*  Ashley Harding, H–A–R–D–I–N–G.
 4           *THE COURT:*  Counsel may proceed.
 5                        **DIRECT EXAMINATION**
 6     *BY MR. KILLINGER:*
 7     *Q.*  Is it all right if I refer to you as Ashley during my
 8     direct examination?
 9     *A.*  Yes.
10     *Q.*  Can you tell us how old you are, please?
11     *A.*  I am 29.
12     *Q.*  Speak into the microphone so the Court Reporter can
13     understand everything you are saying.
14          Where were you born?
15     *A.*  I was born in Gainesville, Florida.
16     *Q.*  And where were you raised?
17     *A.*  Vero Beach.
18     *Q.*  What is your mother's name?
19     *A.*  Wilma Stevens.
20     *Q.*  Your father's name?
21     *A.*  James Stevens.
22     *Q.*  Have you ever been married?
23     *A.*  Yes.
24     *Q.*  When were you first married?
25     *A.*  I was first married in October of 2006.

```
1    Q.   And who did you marry?

2    A.   Chris Williams.

3    Q.   Where were you living when you married Chris Williams?

4    A.   In Vero.

5    Q.   Did you and Chris have any children together?

6    A.   Yes, we had two children, two daughters.

7    Q.   What are their initials?

8    A.   C.W. and H.W.

9    Q.   When was C.W. born?

10   A.   C.W. was born in January of 2006.

11   Q.   And when was H.W. born?

12   A.   She was born in December of 2009.

13   Q.   Was Chris in the military when you married him?

14   A.   He was not in the military when I married him.  He joined

15   the military after we had already been married.

16   Q.   Okay.

17        And what branch of the military was that?

18   A.   The Army.

19   Q.   Did you eventually get a divorce from Chris Williams?

20   A.   Yes, I did.

21   Q.   When was that?

22   A.   I believe that was October of 2012.

23   Q.   And who had custody of C.W. and H.W. when you and Chris

24   were divorced?

25   A.   We shared custody, however, he was not in the states so I
```

1    had the children the majority of the time.

2    Q.  And when you were married to Chris, where did you live?

3    A.  In Vero Beach.

4    Q.  In a house or an apartment?

5    A.  We went from an apartment to renting a house to owning a

6    house.

7    Q.  Okay.

8        And what happened to that house after you and Chris

9    divorced?

10   A.  It was originally foreclosed on.  Then we settled and sold

11   it and split the rest.

12   Q.  Did you get married after you and Chris divorced?

13   A.  Yes, I did.

14   Q.  Who did you marry?

15   A.  Michael Harding.

16   Q.  Do you see Michael Harding in the courtroom today?

17   A.  Yes.

18   Q.  Point him out, please.

19   A.  In the orange jump suit.

20        MR. KILLINGER:  For the record, she identified the

21   Defendant.

22        THE COURT:  The record so notes.

23   BY MR. KILLINGER:

24   Q.  When did you and Michael Harding get married?

25   A.  We got married in May of 2014.

Pauline A. Stipes, Official Federal Reporter

1    Q.  When did you first meet Michael Harding?

2    A.  I met Michael in 2008, at a mutual friend's party.

3    Q.  When did you and Michael Harding get closer together before

4    you got married?

5    A.  July of 2011.

6    Q.  Where were you living when you first started dating Michael

7    Harding?

8    A.  In Vero.

9    Q.  In the house?

10   A.  In the house a little bit and I moved back in with my

11   parents in Vero Beach as well.

12   Q.  That is where your parents live now?

13   A.  Yes.

14   Q.  You are living there with them now, aren't you?

15   A.  Yes.

16   Q.  Did you eventually move in with Michael Harding?

17   A.  I did.

18   Q.  When was that?

19   A.  I would say October 2011.

20   Q.  And when you moved in with Michael Harding, where were you

21   living?

22   A.  At an apartment in Ft. Pierce.

23   Q.  And where were C.W. and H.W. living?

24   A.  They were with me and also moved with me to the apartment

25   in Ft. Pierce.

```
1    Q.  Did you and Michael Harding eventually get married?

2    A.  Yes.

3    Q.  I think you told us that.  That was May 31, 2014?

4    A.  Correct.

5    Q.  Where was Michael Harding working when you and your

6    children first moved in with him?

7    A.  The Ft. Pierce Police Department.

8    Q.  And were you working?

9    A.  Yes.

10   Q.  Where were you working?

11   A.  I was working in Vero Beach at a radiology facility as a

12   receptionist.

13   Q.  Who was taking care of C.W. and H.W. while you and Mr.

14   Harding worked?

15   A.  C.W. was in school, she would go there during the day.

16   H.W., my grandmother took care of her for a little bit and then

17   she went to a preschool in Ft. Pierce close to our apartment.

18   Q.  All right.  And you told us that Michael Harding was

19   working for the Ft. Pierce Police Department.  What kind of

20   hours did he work?

21   A.  He worked midnights.

22   Q.  What is the midnight shift, if you know?

23   A.  As far as I remember, 10:00 to 8:00, 10:00 p.m. to 8:00

24   a.m.

25   Q.  Who picked up C.W. from school?
```

1    *A.*  On most cases, Michael did.

2    *Q.*  And what kind of arrangement did you have for H.W. to be

3    picked up when she was in preschool?

4    *A.*  I would pick her up after I got off work in Vero.

5    *Q.*  Michael didn't pick up H.W.?

6    *A.*  Occasionally he did.

7    *Q.*  Occasionally.  Who did it the most?

8    *A.*  I did.

9    *Q.*  Where was C.W.'s school in relation to the apartment where

10   you lived?

11   *A.*  C.W.'s school was about five minutes away.

12   *Q.*  What time did H.W. -- what time did the classes, I guess,

13   or school end?

14   *A.*  Preschool, any time after 3:00 you could pick them up,

15   until 6:30, but I would drop her off at 6:30 in the morning, so

16   I thought it made more sense to pick her up a little earlier.

17   That is a long day for a little kid.

18   *Q.*  And did you ask on occasion Michael Harding to pick up

19   H.W.?

20   *A.*  I did.

21   *Q.*  What was his response?

22   *A.*  Sometimes he would be okay with it, other times it was an

23   issue.  He often said she is just too difficult to deal with,

24   she is a difficult child.  We kind of agreed he would pick up

25   C.W., and I would pick up H.W.

1   *Q.*  About what time would Michael pick up C.W. from her school?

2   *A.*  When she got out at 3:00 o'clock, 3:15.

3   *Q.*  And from that 3:00 or 3:15, whenever they got home, until

4   you got home, was Michael Harding watching C.W.?

5   *A.*  Yes.

6   *Q.*  Now, did you and Mr. Harding eventually have a child

7   together?

8   *A.*  Yes, we did.

9   *Q.*  When did you get pregnant?

10  *A.*  I got pregnant in June 2014.

11  *Q.*  And when was your younger child, I guess at this point,

12  born?

13  *A.*  March 11, 2015.

14  *Q.*  You just have the three girls?

15  *A.*  Yes.

16  *Q.*  The younger one is a girl, right?

17  *A.*  Yes.  Yes.

18  *Q.*  Okay.

19     Now, did you and Michael Harding and your family, in

20  particular C.W. and H.W., move into a house?

21  *A.*  Yes, we did.

22  *Q.*  Where was that?

23  *A.*  That was in Port St. Lucie.

24  *Q.*  When did you move into that house?

25  *A.*  We moved into the house at the end of September, early

1    October of 2014.

2    *Q.*   And was Michael Harding still working for the Ft. Pierce

3    Police Department at that time?

4    *A.*   No.  He was working for Port St. Lucie.

5    *Q.*   When did he start working for Port St. Lucie?

6    *A.*   I want to say a year after we started dating, so, 2012.

7    *Q.*   What were his work hours when he worked at Port St. Lucie?

8    *A.*   At first, evenings, I think from 3:00 o'clock until 2:00

9    a.m., but then went back to midnight.

10   *Q.*   Was it the same house?

11   *A.*   Uh-hum.

12   *Q.*   10:00 to 8:00 a.m.?

13   *A.*   Yes.

14   *Q.*   Did you work full time when you were pregnant?

15   *A.*   I did.  Yes.

16   *Q.*   And again, what were your work hours?

17   *A.*   8:30 to five o'clock.

18   *Q.*   Was that Monday through Friday?

19   *A.*   Monday through Friday.

20   *Q.*   Now, did C.W. and H.W. have to change schools when you

21   moved from Ft. Pierce to Port St. Lucie?

22   *A.*   Yes, they did.

23   *Q.*   What arrangements did you and Michael have to pick the

24   children up at that point?

25   *A.*   Once we moved to Port St. Lucie, I was pregnant with our

1  daughter, and we moved to Savannah Ridge, Port St. Lucie, and I

2  picked them up at that point.

3  Q.  Was that an elementary school?

4  A.  Yes.

5  Q.  After your younger daughter was born, did you go back to

6  work?

7  A.  I did, in September, and I started working from home, which

8  is what I do now.

9  Q.  From March 2015 to September, you were not working?

10 A.  I was not working.

11 Q.  And were you at home all the time after that?

12 A.  Yes.

13 Q.  Did you notice any change in Michael's -- Mr. Harding's

14 behavior after your younger child was born?

15 A.  I did.

16 Q.  What was that?  Can you describe that?

17 A.  The best way I can describe it is more distance between he

18 and I in our relationship.

19     I felt more overwhelmed, now I had three children, and I --

20 distance is the best way I can describe it.

21 Q.  In addition to the fact that you were at that point home

22 all the time?

23 A.  Right.

24 Q.  Did Michael Harding take any time off from work when the

25 baby was born?

```
 1    A.  He did.

 2    Q.  How much time?

 3    A.  I believe it came out to about two weeks.

 4    Q.  So, you have known Michael Harding first as girlfriend,

 5    fiancee' and his wife, since 2011?

 6    A.  Yes.

 7    Q.  And do you remember what day it was he got arrested?

 8    A.  Yes.

 9    Q.  When was that?

10    A.  September 23, 2015.

11    Q.  I want to ask you a few questions about Michael Harding's

12    drug use, including alcohol.

13    A.  Okay.

14    Q.  Did Michael Harding use drugs?

15    A.  As far as I know, he did have prescription drugs prescribed

16    to him.  I didn't feel that he was abusing them, I didn't

17    notice that he was abusing them.  He took them as prescribed.

18    Q.  Do you recall what kind of drugs they were?

19    A.  I know he had Klonopin for anxiety and hydrocodone as well

20    for headaches, and after his shoulder surgery, he was

21    prescribed them for the pain.

22        Like I said, as far as I knew, he took them the way he was

23    supposed to.

24    Q.  Did you feel that Michael Harding was abusing drugs,

25    prescription drugs?
```

65

```
 1    A.   I did not.
 2    Q.   Okay.
 3         Did you feel Michael Harding was abusing alcohol?
 4    A.   I did not.
 5    Q.   Was he a good worker?
 6    A.   As far as I know from his co-workers and everything, they
 7    enjoyed working with him, he was well-known.
 8    Q.   Would he usually call in sick or take time off, not want to
 9    go to work?
10    A.   If he did, it was to spend time with the family.
11    Q.   How would you describe your relationship with Michael
12    Harding up to the time your younger child was born?
13    A.   Almost perfect.
14    Q.   Did there come a time you and Michael Harding got a camping
15    tent?
16    A.   Yes.
17    Q.   When was that?
18    A.   It was before the baby was born, maybe around
19    Christmastime, and the reason we got the tent is a lot of times
20    my dad would take my children out in his backyard and we would
21    go camping, and it is something they enjoyed.
22         Michael brought it home one day saying the new baby is
23    coming, so it would be a good idea to have that one-on-one time
24    with the girls so they don't feel left out.  It is hard with a
25    new baby coming.
```

Pauline A. Stipes, Official Federal Reporter

```
 1    Q.  Michael Harding was the one who purchased the tent?
 2    A.  Yes.
 3    Q.  Was this a new tent that he purchased or one he got from
 4    your father?
 5    A.  It was a new tent.
 6    Q.  Do you remember what color it was?
 7    A.  I would say dark red and gray, tan.
 8    Q.  Did you and Michael Harding ever use that tent?
 9    A.  He and I did not.  I was pregnant.  I didn't want any part
10    of camping.
11    Q.  How about Michael Harding with C.W. or H.W.?
12    A.  Yes.
13    Q.  Can you describe that to the Court?
14    A.  Yes, maybe on three occasions that I definitely know, it
15    would be weekends, and he wouldn't have to work, so he would
16    say, you know, let me do a camp out with the girls.
17         They wanted to do it, and they would set the tents up on
18    our back porch or our backyard, and we hooked up the laptop so
19    they could watch movies, and still kind of camp with
20    technology.  The girls seemed to enjoy it.
21         The younger one always came in around midnight.  She always
22    said she was afraid.
23    Q.  That was H.W.?
24    A.  H.W. would come in and get in bed with me.
25    Q.  And would C.W. spend the rest of the night in the tent?
```

```
1    A.   Yes, uh-hum.   There is one occasion when she didn't, and
2    she said it was just too hot outside.
3    Q.   Now, did you and Michael Harding have cell phones?
4    A.   Yes.
5    Q.   Did you each have your own cell phone?
6    A.   Yes.
7    Q.   Who was responsible for buying and hooking up the cell
8    phones?
9    A.   Michael was.
10   Q.   Did you have a computer in the house?
11   A.   Yes.
12   Q.   What kind of computer?
13   A.   MacBook Pro.
14   Q.   Just the one computer?
15   A.   Just the one.
16   Q.   Did you and Michael share that computer?
17   A.   Yes.
18   Q.   Did you ever use Michael Harding's cell phone?
19   A.   On occasion if I needed it, but I usually always had mine.
20   Q.   What was Michael Harding's attitude towards you using his
21   cell phone?
22   A.   That was off limits.
23   Q.   Off limits?
24   A.   He would always say I could go on there if I wanted.
25   Usually, if I grab for the phone, he would have to go on there
```

```
 1    first even though I knew the pass code to get on.  It would
 2    seem like he was hiding something which put me under the
 3    impression that he was being unfaithful.
 4    Q.  So, you thought maybe he was texting or talking to other
 5    women?
 6    A.  Right.  Which I looked into myself and never found anything
 7    on that route.
 8    Q.  Did you pretty much respect his privacy and his cell phone?
 9    A.  I did.
10    Q.  And who was your service provider for the cell phone, do
11    you recall?
12    A.  AT&T.
13    Q.  Was there ever discussions or an issue about the amount of
14    data being used on the cell phones?
15    A.  Um-m-m, a little bit after the baby was born, I noticed
16    that the data, a lot of it had been used and that was a little
17    strange to me because I was always at home, so I would use
18    wifi.
19        When I talked to Michael about it, he would say with him
20    working midnights, if it is slow, or whatever, he would watch
21    movies.  It made sense.
22    Q.  Okay.
23        I would like you to think back to September 22nd, last
24    year.
25        What happened that day?
```

1   *A.*   That was the day he was arrested.

2   *Q.*   Were you at home?

3   *A.*   Yes, I was.

4   *Q.*   Can you describe for the Court what happened?  Was it early

5   in the morning?

6   *A.*   Yes.

7   *Q.*   Describe for the Court what happened.

8   *A.*   It was around the same time Michael would normally get off

9   work, and there were a few instances where he forgets his keys.

10   I heard a knock at the door and I told C.W. to let your dad in.

11   They refer to him as dad.

12        I told her to let your dad in, and Michael came in and

13   said, Ashley, I need you to come over here, and however many

14   agents followed him in.

15        I was currently getting the two daughters ready for school.

16        So, the agents kept us spread out around the house, were

17   looking in rooms, and to keep the girls calm, I kept getting

18   them ready, and H.W. remembers a letter being put on her door,

19   and it was a D, and I told her that is because you are the

20   daughter, D is for daughter, and then I took them to school.

21        I didn't really ask any questions, with the girls being

22   there, I had no idea what was going to be said.

23   *Q.*   Did the girls go to school that day?

24   *A.*   They did.

25   *Q.*   Who took them to school?

1    *A.*   I took them to school.

2    *Q.*   What did you do after you dropped them off?

3    *A.*   As soon as I dropped them off, I came back to the house and

4    tried to get as much information as I could.  I really had no

5    idea what was going on.

6    *Q.*   Did you have an opportunity to speak with Michael Harding

7    while he was still at the house?

8    *A.*   Yes, I did.

9    *Q.*   Okay.

10        What did you ask him, and what did he say?

11   *A.*   We went outside and I asked him what was going on, and he

12   basically says that he didn't want to involve me, but he has

13   had a problem since he was young, and when I asked him --

14   because I had known about -- before we went outside, I had

15   known what the agents were looking for, and I asked him, these

16   type of videos and things like that, how old are these -- is it

17   teen-agers, what is going on?  He was like, well, no, ten and

18   those type of ages.

19        At that point, it crossed my mind and I asked him if he

20   ever hurt the children in any way, and he said no, he loved

21   them.  He loved them more than anything, and he loved me and he

22   would never do anything to hurt them, and at the end of our

23   conversation, he just said, you are going to leave, you are

24   going to call your mom, you are going to leave and I am not

25   coming back.

71

```
 1   Q.   And at some point, did the agents take him away?
 2   A.   Yes.
 3   Q.   And what did you do after that?
 4   A.   I called his mother and I called my mother for them to come
 5   over.
 6        I didn't want to go over what was going on over the phone,
 7   I asked them to meet at the house so we could talk about what
 8   was going on.
 9   Q.   Okay.
10        Now, did Michael Harding have guns in the house?
11   A.   Yes.
12   Q.   Okay.
13        In addition to a service revolver?
14   A.   Yes.
15   Q.   How many guns, do you know?
16   A.   I can guess about five.
17   Q.   And were these guns in cases?
18   A.   Yes.  As far as I know, they were in cases up high because
19   we did have the children.
20   Q.   Okay.
21        And where were the guns -- well, strike that.
22        When the agents went through and searched your house, they
23   took some things and moved things around?
24   A.   Right.
25   Q.   Where were the guns after they finished searching the
```

1   house?

2   A.  After they finished searching, they were laid out on my

3   sink in the master bedroom.

4   Q.  On the vanity?

5   A.  Yes.

6   Q.  What happened to the guns?

7   A.  Those guns, we were told they were all checked out,

8   unloaded, and saved.  We bagged them up and brought them along

9   with a lot of my other belongings to my house.

10  Q.  And who helped you bag them up?

11  A.  My dad and my mom.

12  Q.  So, whatever guns were left in the house were taken over to

13  your mom and dad's house?

14  A.  We put everything in the garage to go through.  Eventually,

15  we were trying to get everything out of the house.

16  Q.  Did your mom or dad or you say anything on the 22nd of

17  September about the tent?

18  A.  Yes.  My dad asked me if I wanted him to grab the tent, and

19  I said that is irrelevant, I don't care about the tent,

20  whatever, just get the stuff we need, and we can always come

21  back.  Let's get over there, get the girls stable.  I told him,

22  don't worry about it.

23  Q.  All right.  Again, another question on the tent.

24      What kind of bedding or pillows or what did they sleep on

25  when they were inside the tent?

1   *A.*  We had a lot of comforters, and one of the comforters was

2   like the oldest one, so they would use that to put over other

3   blankets as cushioning to sleep on.

4   *Q.*  Now, who picked up H.W. and C.W. from school on the 22nd?

5   *A.*  I did.

6   *Q.*  Did you have any conversations with them?

7   *A.*  I did.

8   *Q.*  What did you tell them?

9   *A.*  In the car ride home I told them -- we were still referring

10  to him as dad -- I said your dad is in trouble, he was doing

11  something he shouldn't have been doing, and he is going to have

12  to go to jail, but we are going to be okay, and we are going to

13  go over to my parents' house and everything will be fine, and

14  they started crying.  They were very upset.

15  *Q.*  Now, did you talk to the girls together or kind of

16  separately?

17  *A.*  At that point in the car, that is all I said in the car to

18  them.

19  *Q.*  That was the conversation in the car?

20  *A.*  Right.

21  *Q.*  How about when you got back to the house, did you have

22  further conversation with them?

23  *A.*  Yes, I took C.W. into her room, because she was older, I

24  explained to her, I said your dad had pictures of people

25  inappropriately without their clothes on, and some of them were

74

```
1   kids, and some of them were kids that are close to your age.
2       I said, did you ever get that feeling in your stomach like
3   a weird feeling, did you ever feel uncomfortable ever around
4   your dad?  And she said, yes, all the time.  And then she got
5   hysterical, and after I calmed her down, I told her, you know,
6   you can tell me anything, and that is when she started
7   describing to me a few things that had happened between Michael
8   and her.
9   Q.  And did you ask, or did she tell you why she hadn't told
10  you about this before?
11  A.  She was afraid.
12  Q.  Did you have any discussions privately with H.W. on the
13  22nd?
14  A.  Not with -- no, I did not.
15  Q.  And on the 22nd of September, 2015, how old was H.W.?
16  A.  H.W. was five.
17  Q.  And C.W.?
18  A.  Nine.
19  Q.  What were some of the things that C.W. did tell you on the
20  22nd?
21  A.  On that day she told me that when I would go take a nap
22  with H.W., that Michael would ask her to come in the living
23  room with him, or in the bedroom with him, and she said he
24  would take his clothes off and sit beside her.  And I said
25  okay, did anything else happen?  And at first, she was hesitant
```

1  and didn't want to say anything, but then she said he would

2  touch himself and ask her to touch him as well.

3      At that point, she said she would say no to him, and that

4  is all she really told me at that point.

5  Q.  Now, when C.W. told you these things, what was your

6  reaction, or how did you react, what did you do?

7  A.  Well, I walked out of the room calmly and then I went

8  hysterical, and I was screaming and crying and vomiting, and I

9  called Agent Rey because I didn't know what else to do, and she

10  was telling me things and I figured someone needed to interview

11  or intervene as soon as possible because she was opening up to

12  me.

13  Q.  Did you eventually get in contact or were you contacted by

14  a detective from the Port St. Lucie Police Department?

15  A.  Yes.

16  Q.  Who was that?

17  A.  Sheila LaGrega.

18  Q.  That same day?

19  A.  Yes.

20  Q.  That must have been late afternoon?

21  A.  Yes.

22  Q.  Or early evening?

23  A.  Yes.

24  Q.  What did you do after Sheila LaGrega got to your house?

25  A.  She spoke with me a little bit, I gave her a brief

1    description of what was going on and what (redacted) -- sorry,

2    C.W. had told me, and she explained to me that if it was okay,

3    that we would go back to the police station and do some

4    interviews and just see what the girls have to say.

5        And so, that is what we did.

6    Q.   Was that a pretty late night back at the police station?

7    A.   Yes, we were there for hours.

8    Q.   And did Detective LaGrega interview C.W. and H.W. that

9    night?

10   A.   Yes, she did.

11   Q.   Were you present when she was interviewing the children on

12   the 22nd?

13   A.   I wasn't present in the room with C.W.  With H.W. I was.

14   Q.   Now, at some point after September 22nd, and after the

15   first interviews, did C.W. or H.W. come to you and tell you

16   other things about what Michael Harding had done to them?

17   A.   Yes.

18   Q.   Do you recall when that was?

19   A.   Um-m-m, I know it was part of that same week, maybe the

20   weekend, but I had explained to the girls that if anything came

21   up, just come talk to me and I will call Sheila, and we can

22   talk about it.

23       You know, sometimes you might remember things, especially

24   to the younger one -- I'm sorry, I am trying to think --

25   Q.   Let me ask you a question.

```
 1        That was sometime after the 22nd?
 2   A.   Right.
 3   Q.   You think it was after that weekend?
 4   A.   Yes.
 5   Q.   That would have been the 25th, 26th, 27th?
 6   A.   Uh-hum.
 7   Q.   And after any of these other disclosures were made to you,
 8   did you call Sheila LaGrega?
 9   A.   Yes.
10   Q.   When was that?
11   A.   Any time I heard anything or anything came up, I called
12   Sheila.
13   Q.   As a result of that, did you bring the two children in for
14   additional interviews?
15   A.   Yes.
16   Q.   Again, if you remember -- and if you don't, that is fine --
17   do you recall anything that H.W. specifically told you in
18   reference to what Michael had done to her on either the 25th,
19   26th or 27th?
20   A.   I'm trying to remember if she told me this one bit of
21   information on that day or if it was after that day because it
22   all kind of came together.
23        She --
24   Q.   Regardless of when it was, what did she tell you?
25   A.   She did say something about a time in the apartment that he
```

```
 1   was giving her a shower and she basically said that he made her

 2   touch him, and she explained it as he went to the bathroom on

 3   her and told her to clean it up before your mom gets here, and

 4   don't tell your mom.

 5   Q.  Did H.W. eventually provide information about anything that

 6   had to do with the tent?

 7   A.  Yes.

 8   Q.  Do you recall when that was?  Was that that same period?

 9   A.  Around the same time, yes.

10   Q.  What did she tell you about that?

11        MR. PEACOCK:  Your Honor, I object to the hearsay

12   nature of this line of testifying.

13        THE COURT:  Any response?

14        MR. KILLINGER:  Hearsay is admissible, Judge.

15        MR. PEACOCK:  It is admissible, but there is also a

16   confrontational issue.

17        THE COURT:  I will overrule the objection and allow

18   the testimony.

19        MR. PEACOCK:  The confrontation clause as well.

20        THE COURT:  Yes.

21        MR. KILLINGER:  It is difficult, I know this is

22   difficult, we already had testimony.

23   BY MR. KILLINGER:

24   Q.  Suffice it to say one of the incidents she talked to you

25   about had to do with the tent?
```

1    A.   Yes.

2    Q.   When you learned something may have happened involving that

3    tent, what did you do?

4    A.   The first thing I did is I contacted Sheila and also, at

5    that same time, went back to the house to find the tent.

6    Q.   Was it there?

7    A.   No.

8    Q.   And when you left the house on the 22nd of September, did

9    you lock it?

10   A.   Yes.

11   Q.   Who had access to that house between September 22nd and the

12   time you went back to find the tent and found it missing?

13   A.   The only person besides myself was Michael's mom.

14   Q.   Do you know for a fact she did go to the house?

15   A.   I know she definitely went back to the house.

16   Q.   Now, was there ever any information that you learned that

17   had to do -- that involved a screwdriver?

18   A.   Yes.

19   Q.   Who did that involve?

20   A.   H.W.

21        MR. PEACOCK:  May I have a standing objection to this?

22        THE COURT:  Yes.

23   BY MR. KILLINGER:

24   Q.   And can you tell us about any incidents that happened at

25   your parents house when -- did you eventually start going

1  through the boxes and bags of things?

2  A.  Yes.

3  Q.  Okay.

4     Let's talk first about, did you find or did somebody show

5  you a gun case that had some -- what I refer to as sex toys in

6  it?

7  A.  Yes.

8  Q.  Who found that?

9  A.  My mother.

10  Q.  Okay.

11     Did she ask you whether they were yours?

12  A.  Yes, she did.

13  Q.  Were they?

14  A.  No.

15  Q.  What were they?

16  A.  They were three small -- I want to say a vibrator, I don't

17  know what to refer to the other ones as, they were small, and I

18  believe two pink and one purple.

19         MR. KILLINGER:  May I approach the witness, Your

20  Honor?

21         THE COURT:  Yes.

22  BY MR. KILLINGER:

23  Q.  I show you what is in evidence as Government Exhibit 8?

24  A.  Yes.

25

1    *Q.*   Do you recognize the items in that picture?

2    *A.*   Yes.

3    *Q.*   What is it?

4    *A.*   The gun, gun case and sex toys.

5    *Q.*   Is that Michael Harding's gun, or one of them?

6    *A.*   Yes.

7    *Q.*   So, what did you do, if anything, with those three items

8    that you just identified after your mom and you found them?

9    *A.*   I called Sheila, we zipped them back up, put them in a bag

10   and we took them to Sheila the first chance we could get.

11   *Q.*   Now, did there come a time when you and your children were

12   living back at your mom and dad's house in Vero that something

13   happened with a screwdriver?

14   *A.*   Yes.

15   *Q.*   What was that?

16   *A.*   We were all at the house.  My mom was going through boxes

17   that were in the garage, bringing them in, and a lot of the

18   tools that we had brought from my house to my parents' house

19   were kind of laid out.

20        This one specific tool, my mom just came in and she is

21   like, is this from your house, this screwdriver?

22        And H.W., in front of everyone, screamed and said that's,

23   that's what --

24            *MR. PEACOCK:*  Same objection.

25            *THE COURT:*  Overruled.

1          *THE WITNESS:*  She said that's what daddy -- Michael

2    used to hurt me with.

3    *BY MR. KILLINGER:*

4    *Q.*  And what did you do with the screwdriver?

5    *A.*  Put it in a ziplock bag and brought it to Sheila.

6    *Q.*  Let me show you Government Exhibit 14.

7         Take a look at Government Exhibit 14 and tell me if you can

8    identify what is depicted in the photograph.

9    *A.*  Yes, that is the screwdriver that H.W. --

10          *MR. KILLINGER:*  I move Government Exhibit 14 into

11   evidence.

12          *THE COURT:*  Any objection?

13          *MR. PEACOCK:*  Relevance, based on the hearsay

14   objection I made before.

15          *THE COURT:*  Overruled.  14 is admitted.

16       (Whereupon Government Exhibit 14 was marked for evidence.)

17   *BY MR. KILLINGER:*

18   *Q.*  Is Exhibit 14 one of the screwdrivers, or one of the set of

19   tools that were at your house in Port St. Lucie?

20   *A.*  Yes, those were only ours.

21   *Q.*  Now, Ashley, did there come a time when Agent Rey contacted

22   you and told you that he would like you to look at a particular

23   image?

24   *A.*  Yes.

25   *Q.*  Okay.

```
 1        And did you look at that image?
 2   A.   I did.
 3   Q.   Where was that?
 4   A.   At the Homeland Security in Ft. Pierce.
 5   Q.   And was Agent Rey present?
 6   A.   Yes, he was.
 7   Q.   I am going to show you very briefly -- you don't have to
 8   look at it if you don't want, it is already in evidence --
 9   Government Exhibit 9.
10        Is that the image you looked at?
11   A.   Yes.
12   Q.   Is that C.W.?
13   A.   Yes, it is.
14   Q.   Do you recognize Michael Harding's penis in that picture?
15   A.   I do.
16   Q.   Ashley, if you could take a minute, as long as you are here
17   on the witness stand, would you tell the judge how these
18   incidents have changed your life and your children's life and
19   your mother's life?
20   A.   I wrote something.  Am I able to read that or just a
21   brief --
22   Q.   Um-m-m, you can read it now or you can allocute later on.
23   If she has it --
24        THE COURT:  If you are comfortable reading it now,
25   that is fine.
```

Pauline A. Stipes, Official Federal Reporter

```
 1              THE WITNESS:  Okay.  It is kind of long.
 2              THE COURT:  Okay, take your time.
 3              THE WITNESS:  All right --
 4              THE COURT:  Is it easier for you to stand there and
 5    look at me or are you okay?
 6              THE WITNESS:  I am okay.
 7              I wanted to speak today on behalf of my children and
 8    to explain why I ultimately feel Michael Harding should spend
 9    the rest of his life in prison.  When Michael and I began our
10    relationship, I was a single mother with two young daughters.
11    Michael seemed like the perfect partner and father figure.  He
12    gained my trust with ease and showed his affection, care and
13    love for my daughters.
14              He always talked about wanting a big family and he
15    helped to support my girls and I.  We eventually got married
16    and had our first child together.  We had the ideal family and
17    complete relationship, or that is what I thought.
18              When Michael came home that day in September
19    accompanied by Homeland Security I had no reason to ever
20    speculate that he could have hurt my children in any way.  I
21    was in shock and --
22              (Pause.)
23              I was in shock and couldn't fathom what could have
24    possibly happened.  I married this man thinking he was the
25    perfect father, friend and partner.  But as the day went on, I
```

1    was beginning to realize I had been sharing my life with a

2    monster.  My daughters, along with myself, have done nothing to

3    deserve what he has put my family through.

4         Michael was the provider for our household.  We lost

5    everything.  The material possessions serve no value to me,

6    it's the loss of trust and the arrival of fear that we have had

7    to experience since this has come to light.

8         Both of my daughters, along with myself, are in

9    therapy and will need to continue this healing process.  He

10   ruined the definition of trust.

11        My daughters are in constant fear of everyone,

12   especially men and police officers.  They sleep with me many

13   nights after having nightmares and being too afraid to sleep.

14   He ruined many years of my daughters' childhood and stole their

15   innocence that can never be replaced.  They will be affected by

16   Michael's actions for the rest of their lives.

17        He left my daughter with the only vision of a father

18   is that of someone who uses them and hurts them, someone that

19   isn't safe.  My youngest daughter will grow up without a father

20   as well.

21        Michael used his position as a police officer to abuse

22   and exploit children.  He used this power to gain respect and

23   trust and to further hide his true demeanor.  He had a sick

24   plan and he targeted me as a single mother.

25        People that are no longer in my life and daughters'

Pauline A. Stipes, Official Federal Reporter

```
 1    life are the result of Michael Harding's actions.  Those
 2    people, the ones supporting Michael, the ones that called my
 3    daughters liars, these people will never ever get close to my
 4    children.  They will never get the opportunity to get to know
 5    my daughters.  Supporting this man who he preyed on my children
 6    is disturbing.
 7          My worst nightmares are real.  I live with unbearable
 8    guilt that I could not fulfill the duty I had as a mother which
 9    was to protect my children and to keep them from being harmed.
10    He tried to destroy the special bond that I share with my
11    daughters.  Our lives have been turned upside down and will
12    never been the same again.
13          Michael Harding was fully aware and is still aware of
14    his actions.  I do not believe for one second he had any doubt
15    about what he was doing.  He passed numerous polygraphs and
16    psych exams.  He is a monster and he should have to spend the
17    rest of his life behind bars without an opportunity to ever
18    abuse or take away anyone else's innocence.  He stole something
19    from my children and my family that can never be replaced.
20          MR. KILLINGER:  No further questions.
21          THE COURT:  Thank you.  Any cross-examination?
22          MR. PEACOCK:  One minute, Your Honor.
23          THE COURT:  Okay.
24          MR. PEACOCK:  Briefly, Judge.
25          THE COURT:  Okay.
```

Pauline A. Stipes, Official Federal Reporter

87

```
1            MR. KILLINGER:  Judge, may I approach the witness
2    briefly?
3            THE COURT:  Yes.
4                      CROSS-EXAMINATION
5    BY MR. PEACOCK:
6    Q.  Do you need to take a break?
7    A.  I am okay.
8    Q.  You are okay.  If you do, just let me know.
9        I am going to ask you a few things about what you testified
10   here so we can clarify those matters.
11       You indicated that Michael didn't like to pick up H.W. from
12   day care?
13   A.  Correct.
14   Q.  How old was she during this time period?
15   A.  She was anywhere from four, five, six.
16   Q.  Okay.
17       Often Michael would -- this would be after one of his
18   shifts as a police officer; is that right?
19   A.  Right, after he would get off in the morning.
20   Q.  And he often would want to sleep after his shift as a
21   police officer, correct?
22   A.  Correct.
23   Q.  And H.W. couldn't be left alone by herself because she was
24   so young, correct?
25   A.  No, not by herself, but with her sister being present, and
```

```
1    only having about an hour before I got home, they were fine

2    together.

3    Q.  No, I understand, but one of the reasons he wasn't

4    comfortable was going to sleep and leaving them alone, that is

5    one of the reasons he didn't want to have H.W -- to pick her

6    up?

7    A.  When I would return home and he had C.W., he was always

8    wide awake.

9    Q.  So, he didn't sleep after he got home from his shift?

10   A.  I'm sure he did.  As far as I know, when I got home, he was

11   wide awake with C.W.

12   Q.  Never sleeping?

13   A.  Occasionally.

14   Q.  Now, you indicated you didn't know that Michael was abusing

15   pills; is that right?

16   A.  As far as I know, he didn't look like he was abusing pills.

17   Q.  Did you know he was using marijuana?

18   A.  Yes, I did.

19   Q.  And that is not legal, correct?

20   A.  Correct.

21   Q.  Was he abusing marijuana?

22   A.  If that is the definition, I guess that would be correct.

23   Q.  Did you use marijuana with him?

24   A.  I have before, yes.

25   Q.  More than one time, correct?
```

```
 1   A.  Yes.

 2   Q.  How about prescription pills, did you use those with him?

 3   A.  I have before, yes.

 4   Q.  More than one time?

 5   A.  Yes.

 6   Q.  That would be abuse, wouldn't it?

 7       Were you using them for a medical condition?

 8   A.  No.

 9   Q.  And how about alcohol, he was using alcohol, a fair amount,

10   before the time he was arrested, correct?

11   A.  Socially?

12   Q.  Yes.

13   A.  Maybe once a week, twice a week.

14   Q.  Sometimes drinking to excess?

15   A.  I guess, if you --

16   Q.  Now, after the search -- that was the 22nd?

17   A.  Yes.

18   Q.  After the search on the 22nd, you left the house, correct?

19   A.  I did.

20   Q.  And you went to your parents' place I think you said?

21   A.  Right.

22   Q.  Now, at some point, though, you came back to the house,

23   right?

24   A.  Right.

25   Q.  And you were understandably upset?
```

1    *A.*  Yes.

2    *Q.*  And you got a bunch of his possessions and threw them in

3    the pool, correct?

4    *A.*  Yes.

5    *Q.*  In fairness, it was a crazy time?

6    *A.*  Yes.

7    *Q.*  You weren't trying to keep track of the tent in the garage

8    at the time, correct?  That wasn't your primary concern, was

9    it?

10   *A.*  No.

11   *Q.*  At that point, you probably didn't even know you had a tent

12   in the garage?

13   *A.*  I did know we had a tent in the garage.

14   *Q.*  Well, you weren't thinking about it, right?

15   *A.*  Not at that moment.

16   *Q.*  And you don't know what happened to the tent?

17   *A.*  I know the tent was in the garage, and when I returned, the

18   tent was not in the garage.

19   *Q.*  Well, there were a lot of things that were taken out of the

20   house, weren't there?

21   *A.*  Yes.  Items that I knew about.

22   *Q.*  Okay.

23        When was the last time the tent was used?

24   *A.*  The last time the tent was used was the day before —— let's

25   see, April 10th of 2015.

1    *Q.*  The day before April 10?

2    *A.*  No.  I was going to say the day before I had to take our

3    younger daughter in and realized she had to have heart surgery,

4    that was the last time the tent was used.

5    *Q.*  How often had it been used before that?

6    *A.*  Maybe three, four times.

7    *Q.*  And it was purchased when?

8    *A.*  It was purchased right before Christmas, or right after

9    Christmas.

10   *Q.*  But it wasn't used between April and September?

11   *A.*  No.

12   *Q.*  Now, at some point, Detective LaGrega came back to the

13   house and searched for knives and tools, correct?

14   *A.*  Right.

15   *Q.*  And didn't find any, right?

16   *A.*  Correct.

17   *Q.*  Were you with her?

18   *A.*  Yes, I was.

19   *Q.*  Is it your testimony that those tools had been moved from

20   the house before that?

21   *A.*  Yes.

22   *Q.*  And you told her that right then and there, correct?

23   *A.*  I did, but I also told her we had a common junk drawer in

24   the kitchen.  I said we could always look in there.  I didn't

25   think to look in there before, it was a drawer we tossed

92

```
1    everything in.
2    Q.  So, then, did you and Detective LaGrega -- where had the
3    knives and screwdrivers been moved to, your parents' house?
4    A.  Yes.
5    Q.  Did you and Detective LaGrega go to your parents' house and
6    get the screwdrivers and knives?
7    A.  No, we did not.
8    Q.  Why not?
9    A.  I'm not sure.
10   Q.  You told her right then and there, though, correct, that
11   the screwdrivers were at your parents' house?
12   A.  Right.
13   Q.  She didn't want to go get them?
14   A.  Maybe I told her I would bring them to her.  No, she did
15   not come to my house to get them.
16   Q.  When was this, right after the 22nd?
17   A.  Sometime thereafter.
18   Q.  Within a week?
19   A.  Within a week.
20   Q.  And so, did you go to your parents' house and get the tools
21   and knives and take them to Detective LaGrega?
22   A.  Yes, I got everything that we spoke about.
23   Q.  When did you do that?
24   A.  I'm not really sure.
25   Q.  Was it within a month after this?
```

1    *A.*  It was before within a month.

2    *Q.*  Okay.

3         And did Detective LaGrega give you those items back?

4    *A.*  No.  She has them all.

5    *Q.*  Yet it was your testimony that H.W. identified the

6    screwdriver?

7    *A.*  Let me back up here.

8         H.W. identified the screwdriver at my house.  That next day

9    I brought that to Sheila LaGrega.

10   *Q.*  Okay.

11   *A.*  What she was looking for in the house was, in H.W.'s

12   interview, she mentioned something about a knife.  That is when

13   I brought Sheila LaGrega over to my house to see what she was

14   talking about.

15        At that point, H.W. had not said anything about that

16   screwdriver.  That happened after the fact.  That is why Sheila

17   would not go to my parents' house, that wouldn't make any

18   sense.

19   *Q.*  Okay.

20        Just so we are clear, when was the incident when H.W.

21   identified the screwdriver?

22   *A.*  That was maybe two weeks after all of this, after she had

23   already had interviews with Sheila.

24   *Q.*  Now, when was it that Detective LaGrega and yourself

25   searched the house for the tools and the screwdriver?

1  *A.*  I would say maybe a few days after the interview she said

2  that (redacted) -- sorry, H.W. drew a picture of a knife and a

3  screwdriver.

4      At that point, H.W. hadn't said anything about it.  She had

5  just drew those.

6  *Q.*  You were there when H.W. did that?

7  *A.*  I was not there when she actually drew that picture.  I was

8  there for most of the interview.  There were times when I

9  stepped out.

10  *Q.*  And when was that interview?

11  *A.*  There were a couple of interviews.  There was one on the

12  22nd.

13  *Q.*  When was the next one?

14  *A.*  Maybe a few days after that.  I believe there were three in

15  total.

16  *Q.*  Were they all at the Port St. Lucie police station?

17  *A.*  Yes.

18  *Q.*  Were you present for all three interviews of H.W.?

19  *A.*  Yes, I was present, but I wasn't always in the room with

20  her.

21  *Q.*  Now, did you see those drawings that night?

22  *A.*  Briefly, I did see those drawings.

23  *Q.*  That was on the 22nd?

24  *A.*  Yes.  I believe so.

25  *Q.*  And you saw one of the drawings was of a screwdriver?

1    *A.*  I did, but I didn't -- it is a kid's drawing.  I knew we

2    had most of the stuff at my house.  I just figured we did leave

3    some stuff at my old house, so I told her we could go over

4    there and see what we have.  She could take whatever she

5    thought might be relevant.

6    *Q.*  But she didn't want to do that?

7    *A.*  She didn't see anything that was --

8    *Q.*  Now, you said you went -- you took the screwdriver to

9    Detective LaGrega after H.W. made that spontaneous comment?

10   *A.*  Right.

11   *Q.*  And when was that?  Do you know the date?

12   *A.*  I don't know the date exactly.  This was all a big --

13   *Q.*  Right, I understand.

14       Can you estimate?

15   *A.*  I would say it was probably a week after all of this

16   happened.

17   *Q.*  A week after, okay.

18       *MR. PEACOCK:*  Thank you, ma'am.

19       *THE COURT:*  Anything further?

20       *MR. KILLINGER:*  If I may, Your Honor, I want to look

21   at one of the exhibits for redirect.

22                    **REDIRECT EXAMINATION**

23   *BY MR. KILLINGER*:

24   *Q.*  Ashley, you said on one of the interviews that H. W. drew

25   pictures, you looked at them briefly?

Pauline A. Stipes, Official Federal Reporter

1    *A.*  Yes.

2    *Q.*  And is that -- at the time the pictures were drawn, you

3    referenced she also drew pictures of a screwdriver?

4    *A.*  Yes.

5    *Q.*  Is that the first time you had any idea a screwdriver might

6    have been involved?

7    *A.*  Yes.  She didn't mention anything else about it, she just

8    drew it.  It wasn't until that night that she came out with it.

9    *Q.*  I am going to show you what is in evidence as Government

10   Exhibits 5, 6 -- 3, 5 and 6, and ask you to take a look at

11   Government Exhibit 5.

12   *A.*  Okay.

13   *Q.*  What is the date on the top of that piece of paper there?

14   *A.*  September 29, 2015.

15   *Q.*  So, the 29th of September?

16   *A.*  Okay.

17   *Q.*  All right.  Is there a picture or one or more pictures of a

18   screwdriver in those drawings?

19   *A.*  Can I go through them?

20   *Q.*  Yes.

21   *A.*  Okay, I'm sorry.  I'm guessing this would be it.  I mean --

22   yes, I see the knife and that looks like it would be a

23   screwdriver.

24   *Q.*  Okay.

25        H.W. -- is that her drawing?  That is her handwriting?

```
 1    A.   Yes.

 2    Q.   That is not C.W.?

 3    A.   No.

 4    Q.   All right.  Now, was it before, if you know, was it before

 5    or after the 29th, that Detective LaGrega came over to your

 6    house and was looking through your junk drawer at various

 7    things?

 8    A.   I'm going to say it is after because looking at the

 9    drawings, I'm guessing that is why she wanted to come over, to

10    see if she could see anything that the girls drew.

11    Q.   Now, after you -- after the incident happened at your

12    parents' house with H.W. regarding the screwdriver, did you

13    also take down to Detective LaGrega one of the comforters,

14    whatever it was that you described they used in the tent?

15    A.   I did.  Mainly because maybe the print would show up on a

16    photograph if a photograph was taken or something, and I didn't

17    have the tent to present.  I did, I brought that down to her as

18    well.

19    Q.   All right.

20              MR. KILLINGER:  Nothing else, Judge.

21              THE COURT:  Okay, all right.  Thank you very much, you

22    may step down.

23              The Government still has Mr. Walker, 15 minutes

24    direct, no cross, and Mrs. Stevens --

25              MR. KILLINGER:  Your Honor, the Government is not
```

1    going to call Mrs. Stevens.

2            *THE COURT:*  Is Mr. Walker going to be called?

3            *MR. FUNK:*  He will, he will be brief.  May we call him

4    now?

5            *THE COURT:*  Yes.  That is the Government's last

6    witness?

7            *MR. FUNK:*  It is.

8            *MR. PEACOCK:*  Your Honor, I don't anticipate cross.

9    In the event something comes up --

10           *THE COURT:*  That is fine.

11           WAYNE WALKER, GOVERNMENT'S WITNESS, SWORN

12           *THE WITNESS:*  Wayne Walker, W-A-Y-N-E, W-A-L-K-E-R.

13                       **DIRECT EXAMINATION**

14   *BY MR. FUNK:*

15   *Q.*  Where do you work?

16   *A.*  I am employed with the Indian River Crime Lab.

17   *Q.*  How long have you been employed there?

18   *A.*  I started in October 2014.

19   *Q.*  What do you do for them?

20   *A.*  I am a criminologist in the biology section.

21   *Q.*  What does it mean to be a criminologist and what are your

22   duties?

23   *A.*  I examine evidence for blood, semen or saliva.  I try to

24   develop a DNA profile.  I compare it to any known standards I

25   have.  If I have matches, I perform a statistic, how common or

1    rare that profile is, and I write a report of my results, and

2    if need be, testify.

3    Q.  How many years have you been doing that?

4    A.  Prior to being employed with the Indian River Crime Lab, I

5    was with the Florida Department of Law Enforcement for seven

6    years.  The first year and a half I was a forensic -- I was

7    cleaning the lab ordering products, and then I was a crime

8    analyst, basically the same as a criminologist.

9        It was a year and a half training program, and a crime

10   laboratory analyst doing case work for four years.

11   Q.  Did you do any case work on United States of America versus

12   Michael Harding?

13   A.  Yes, I did.

14   Q.  What did you do in that case, generally?

15   A.  I examined some pieces of evidence and compared it to

16   standards that I was given.

17   Q.  Did that include a sex toy or sex toys, as well as a

18   blanket submitted for your evaluation?

19   A.  Yes.

20   Q.  Did you do a comparison between a standard of C.W. and sex

21   toys that were located -- that were located by law enforcement?

22   A.  Yes, I did.

23            MR. FUNK:  May I approach the witness?

24            THE COURT:  Yes.

25

1    *BY MR. FUNK*:

2    *Q.*  I am going to show you what is Exhibit Number 7.  Do you

3    recognize what that is?

4    *A.*  Yes, I do.

5    *Q.*  What is it?

6    *A.*  This was our Exhibit Number 16, which was two oral swabs.

7    *Q.*  Who were the oral swabs from -- let me ask the leading

8    question.  Were the oral swabs from an individual named C.W.?

9    *A.*  Yes, they are.

10   *Q.*  Was it those swabs which you used to compare to DNA found

11   on pieces of evidence in the case?

12   *A.*  Yes.

13   *Q.*  Did some of that evidence include sex toys?

14   *A.*  Yes, it did.

15       *MR. FUNK:*  Your Honor, I am going to show defense

16   counsel what is marked Government Exhibit 15.

17       *MR. KILLINGER:*  Your Honor, that is going to be added

18   to the exhibit list.

19       *THE COURT:*  Yes, I see that.

20       *MR. FUNK:*  May I approach the witness?

21       *THE COURT:*  Yes.  What is 15?

22       *MR. FUNK:*  15 is an image of sex toys.

23       *THE COURT:*  Okay.

24       *MR. FUNK:*  For the record, I am showing the witness

25   what is marked Government Exhibit 15.

```
 1              THE COURT:  Okay.

 2   BY MR. FUNK:

 3   Q.  Do you recognize this?

 4   A.  Yes, I do recognize this photo.

 5   Q.  What is that?

 6   A.  This is a photo of what is our Exhibit 001 of the sex toys.

 7   Q.  Were you able to find a complete DNA profile on the tip of

 8   the pink butt plug, as described in your report?

 9   A.  Yes, I did.

10   Q.  What does it mean to be a complete female DNA profile?

11   A.  So, of all of the areas of the DNA, we are testing 15 areas

12   and I developed markers at all 15 of the areas, and the profile

13   was consistent with being a female profile.

14   Q.  Were you able to compare DNA taken from that sex toy to

15   C.W.'s standard?

16   A.  Yes, I did.

17   Q.  What was the conclusion you had as to whether or not they

18   were from the same individual?

19   A.  They did match, they are from the same individual, and to a

20   reasonable degree of scientific certainty, in the absence of

21   identical twins, C.W., who is our 16, is the source of the DNA

22   profile obtained from the tip of the pink plug.

23   Q.  Did you do any DNA analysis of a blanket that was

24   submitted?

25   A.  Yes, I did.
```

1    *Q.*   Were you able to get a profile from the blanket?

2    *A.*   Yes, I did.

3    *Q.*   What kind of cells were there found on the blanket?

4    *A.*   There were three stains that were semen stains, and it was

5    from two of the three stains in the sperm cell fraction of the

6    samples I took, I developed a male DNA profile.

7    *Q.*   Was there ever a standard of Michael Harding submitted to

8    the lab?

9    *A.*   No, there was not.

10   *Q.*   Were you able to compare the semen stain, DNA profile from

11   the semen stain to DNA that was obtained from the sex toys?

12   *A.*   Yes, I did.

13   *Q.*   What was the conclusion you drew from that comparison?

14   *A.*   There was a -- from the control of the purple vibrator I

15   obtained a partial profile, and this was consistent with the

16   sperm cell fraction found in stains A and B.

17   *Q.*   Did you produce a statistic with regard to that conclusion?

18   *A.*   I did not.

19   *Q.*   Do you know the probability that there would be between

20   those being from the same person?

21   *A.*   Not just off the top of my head.

22   *Q.*   But are they consistent with being the same person?

23   *A.*   Yes, they are.

24          *MR. FUNK:*  That is all I have.

25          *MR. PEACOCK:*  I object to that last conclusion.  There

Pauline A. Stipes, Official Federal Reporter

1  is not a foundation laid that this witness can make that

2  determination.

3       THE COURT:  I will allow you, if you want, to

4  cross-examine on that issue.

5       MR. FUNK:  Thank you, Your Honor.

6       THE COURT:  Okay.  Do you want to cross-examine?

7       MR. PEACOCK:  Yes, ma'am.

8       THE COURT:  Okay.

9                      **CROSS-EXAMINATION**

10 BY MR. PEACOCK:

11 Q.  How many points of comparison did you find between the

12 blanket stain and the sex toy?

13 A.  Nine areas.

14 Q.  Nine areas.

15      That is not enough for you to make a conclusion, is it?

16 A.  It is enough for me to say they are consistent, the nine

17 areas are the same.

18 Q.  There is quite a few more than nine areas, correct, that

19 you normally look for to make a comparison?

20 A.  We test 15, and if I had a standard, I would do that

21 comparison too.

22 Q.  You need 15 just to be valid, correct?

23 A.  No.  Even if I had one area, if I had a standard, I could

24 give a statistic for what the frequency of that match would be.

25 Q.  Okay.

```
 1        You don't have any frequency here today?
 2   A.   No.
 3   Q.   And you were not asked to determine one?
 4   A.   No.  I never got a standard to do any type of testing to do
 5   that comparison.
 6   Q.   As we sit here today, you can't give the Court any
 7   statistical odds on this comparison, can you?
 8   A.   For this one, no.
 9   Q.   All you can say is that there are some markers that are
10   consistent between the two?
11   A.   That is correct.
12   Q.   And that happens frequently in DNA analysis, correct?
13   A.   It really depends, but, yes.  So, some markers can be, but
14   as you continually test different areas and do more
15   comparisons, just the random chance of them being the same is
16   less, less, less, less.
17   Q.   That wasn't done in this case, correct?
18   A.   Correct.
19             THE COURT:  Anything further?  Redirect.
20                      REDIRECT EXAMINATION
21   BY MR. FUNK:
22   Q.   What is the statistical calculation for the comparison
23   between C.W.'s standard and that of the profile that was
24   located on the tip of the sex toy?
25             MR. PEACOCK:  That is outside the scope of cross.  We
```

```
1    were comparing the blanket stain with the sex toy stain.  We
2    did not cross regarding the C.W. comparison.
3          THE COURT:  I sustain the objection.
4          MR. FUNK:  Your Honor, that is all the questions,
5    thank you.
6          THE COURT:  All right.  Thank you very much, you may
7    step down.
8          So, the Government has now presented all of its
9    witnesses?
10         MR. FUNK:  Yes.
11         THE COURT:  Is the defense calling Julie Harding and
12   Elizabeth Perry?
13         MR. PEACOCK:  Yes.  I would appreciate a break.
14         THE COURT:  We will take a break.  All right.  So,
15   would an hour break be sufficient for everyone?  We will be
16   back at 1:30.
17         MR. FUNK:  Yes, Your Honor.
18         THE COURT:  We will be in recess until 1:30.
19         Do we have all Government exhibits up there?
20         MR. KILLINGER:  Yes, Your Honor.
21         THE COURT:  Okay.
22         MR. KILLINGER:  Except the DVD with the child
23   pornography.
24         THE COURT:  Okay.
25       (Thereupon, a short recess was taken.)
```

```
1            THE COURT:  All right.  You may be seated.  Okay.
2            We will now hear from the defense witnesses.  Who
3    would you like to call first?
4            MR. PEACOCK:  That will be Julie Harding, Your Honor.
5            Before we do that, I would like to renew the motion to
6    seal the exhibits in the case.
7            There won't be any defense exhibits.  I think all the
8    exhibits are in.
9            THE COURT:  Right.  I thought a motion had been filed.
10           MR. KILLINGER:  Docket Entry 100, the order.
11           MR. PEACOCK:  We are good to go.  They are sealed.
12           MR. KILLINGER:  I may have to duck out of here.  Mr.
13   Funk is capable of concluding the hearing.  It is an
14   appointment that I have to keep.
15           THE COURT:  Thank you for letting me know.
16           JULIE HARDING, DEFENSE WITNESS, SWORN
17           THE COURTROOM DEPUTY:  State your name and spell your
18   last name, please.
19           THE WITNESS:  I am Julie Harding, H-A-R-D-I-N-G.
20           THE COURT:  Okay.
21                        DIRECT EXAMINATION
22   BY MR. PEACOCK:
23   Q.  Mrs. Harding, do you know Michael Harding?
24   A.  Yes.  He is my son.
25   Q.  And is he your son by birth?
```

1   *A.*   I gave birth to him, yes.

2   *Q.*   When was that?

3   *A.*   December 9, 1987.

4   *Q.*   Where did you give birth to Michael?

5   *A.*   Hollywood, Florida, Memorial Hospital.

6   *Q.*   Now, did Michael ever know his father?

7   *A.*   No, sir.  His father was murdered when I was six months

8   pregnant.

9   *Q.*   Where were you?

10  *A.*   I was living in Manhattan and his father was murdered in

11  Queens.

12  *Q.*   After that time, did you remain in New York?

13  *A.*   I did not.  I came back eight months pregnant to Hollywood,

14  Florida.

15  *Q.*   Where you said you had him in Hollywood?

16  *A.*   Yes, sir.

17  *Q.*   Now, during that period of time, were you the sole source

18  of support financially for Michael?

19  *A.*   I was, sir, yes.

20  *Q.*   Were you also raising him as a single parent?

21  *A.*   Yes, I was.

22  *Q.*   So, you were working during that time period?

23  *A.*   Yes, sir.

24  *Q.*   And what occupations did you have during that time period?

25  *A.*   I worked in the day, office jobs, and in the evening,

1   bartending, and the weekends.

2   Q.   And you bartended.   What type of enterprise did you bartend

3   in?

4   A.   Gay clubs and strip clubs in Miami and Fort Lauderdale.

5   Q.   Did that involve long hours?

6   A.   Extremely long.

7   Q.   Would you get home very, very late or in the early morning

8   hours?

9   A.   Yes, sir.

10   Q.   Working two jobs like that, were there times when you

11   weren't able to come home at all?

12   A.   Yes, sir.

13   Q.   When you had to leave to work, where would you leave

14   Michael?

15   A.   Various friends.

16   Q.   Would you sometimes leave him overnight?

17   A.   Yes, sir.

18   Q.   Often?

19   A.   Yes, sir.

20   Q.   Would you sometimes leave him for days at a time?

21   A.   Yes, sir.

22   Q.   Was this from the time that he was an infant?

23   A.   Yes, sir.

24   Q.   Was this something you had to do to preserve your home?

25   A.   Working two jobs, yes.  Not leaving him for days at times,

1    no.

2    Q.  Let's say between the times when Michael was one and ten,

3    did you struggle with drug addiction?

4    A.  Yes, sir.

5    Q.  What types of drug addiction did you struggle with?

6    A.  Cocaine.

7    Q.  Did that affect your ability to take good care of Michael?

8    A.  The weekends were the worst for me.  During the week I got

9    up and took him to school, organized sports.  During the

10   weekend is when I felt it.

11   Q.  This is when you would be absent?

12   A.  Yes.

13   Q.  This is during the time you worked two jobs?

14   A.  Yes.

15   Q.  Did you also struggle with alcohol?

16   A.  Yes, they went hand in hand.

17          THE COURT:  What did you say?

18          THE WITNESS:  They went hand in hand, alcohol and

19   drugs.

20   BY MR. PEACOCK:

21   Q.  What time period did you struggle with addiction?

22   A.  My addiction, probably 15 years old.

23   Q.  Lasting until when?

24   A.  I stopped doing drugs in 2006.

25   Q.  Would you say in excess of 25 years?

1    *A.* Yes.

2    *Q.* How old would Michael have been in 2006?

3    *A.* That is when we moved up here, about 17.

4    *Q.* Almost an adult?

5    *A.* Yes.

6    *Q.* Throughout this childhood, you had a struggle with alcohol

7    and cocaine?

8    *A.* I did.

9    *Q.* Now, at some point, did you move up to this area?

10   *A.* I did, yes.  We moved up Michael's last year of high

11   school, the end of 2005, 2006.

12   *Q.* Was it the beginning of the last year of high school or

13   middle?

14   *A.* In the middle.

15   *Q.* Was it difficult for Michael?

16   *A.* It was extremely difficult.

17   *Q.* Why did you do that?

18   *A.* His grandpa was dying of cancer, and he and my mother lived

19   here alone.  I didn't want my mother to be alone, so we moved

20   up here.

21   *Q.* Did Michael enroll in school here?

22   *A.* He did.

23   *Q.* How did it work out?

24   *A.* It did not work out too well.

25   *Q.* What do you mean by that?

 1    *A.*   He dropped out.

 2    *Q.*   He did not finish 12th grade?

 3    *A.*   He did not.

 4    *Q.*   Do you know how he obtained his high school diploma?

 5    *A.*   I do.  He went to IRSC in the adult education program.

 6    *Q.*   At this point in Michael's life were you somewhat estranged

 7    from him, had you grown distant?

 8    *A.*   Yes, sir.

 9    *Q.*   How would you describe Michael as a teen-ager?  Was he an

10    outgoing person with tons of friends or a solitary individual

11    and somewhat reclusive?

12    *A.*   Down south he had more friends than up here.  He did get a

13    nice group of friends when he moved up here.

14    *Q.*   How would you describe him, outgoing or solitary?

15    *A.*   He was outgoing with his friends, more solitary with me.

16    *Q.*   With you.  What happened to your relationship with him?

17    *A.*   I'm not too sure.  I met somebody and moved out and left

18    him when he was about 18 or 19, and he stayed by himself for a

19    couple of years.

20    *Q.*   Did he not get along with that person?

21    *A.*   They got along.

22          I moved out of the house and left him in the house.

23    *Q.*   Okay.

24          Now, have you learned that Michael was sexually abused as a

25    child?

```
 1    A.  I have, sir.

 2    Q.  How did you learn that?

 3    A.  Through an ex-girlfriend of his.

 4    Q.  Did you know that before?

 5    A.  No, sir.

 6    Q.  Do you know when that took place?

 7    A.  Personally, I don't know when it took place.  I heard when

 8    he was a child.

 9    Q.  Was that during the time period when he was left with other

10    people?

11    A.  Yes, sir.

12    Q.  So, to your understanding, did Michael totally internalize

13    that?

14    A.  Oh, yes.

15    Q.  Now, you indicated that Michael got his GED at Indian River

16    State College?

17    A.  Yes, sir.

18    Q.  Did he pursue further education?

19    A.  He did.

20    Q.  What did he do?

21    A.  He got his AS in criminal justice.

22    Q.  His Associates Degree?

23    A.  Oh, yes.

24    Q.  Did he attend the Police Academy?

25    A.  He did.  He went through the fast track program and
```

1    completed them both at the same time.

2    Q.   Did he become a police officer?

3    A.   At 20 years old, yes.

4    Q.   Was that a proud moment for the family?

5    A.   Oh, extremely.

6    Q.   Now, were you aware, obviously, when he married Ashley

7    Harding?

8    A.   Yes.

9    Q.   Was that a happy moment, also?

10   A.   Oh, sure.

11   Q.   When they had a child, was that a happy moment?

12   A.   One of the best in my life, yes.

13   Q.   When they bought a house, was it a happy moment?

14   A.   Very.  I was so happy for all of them.

15   Q.   Did you know that Michael had psychological or psychiatric

16   counseling back in 2010?

17   A.   No.

18   Q.   He kept that to himself?

19   A.   Yes.

20   Q.   Did you know he struggled with problems with pharmaceutical

21   drugs?

22   A.   I didn't know he struggled with it.  I knew the anxiety and

23   depression, I knew of that.

24   Q.   Did you know he abused marijuana and alcohol?

25   A.   No, sir.

1    *Q.*  Has this case had an effect on your family?

2    *A.*  Oh, yes, it has.

3    *Q.*  And what kind of effect has it had?

4    *A.*  I've lost my son, I lost my granddaughter.  It's destroyed

5    our family.

6    *Q.*  Has it basically taken a 180 degree turn from where you

7    thought it was?

8    *A.*  Oh, yeah, sure has.

9        He was on top of the world.  He had the world at his

10   fingertips.

11   *Q.*  Now, you sat through the hearing last Monday and you sat

12   through the hearing today.

13       In your mind, are there still redeemable qualities in

14   Michael Harding?

15   *A.*  Oh, of course there are.

16   *Q.*  Does he have the support of family and friends?

17   *A.*  He has a lot of the support and love of family and friends,

18   he sure does.

19           *MR. PEACOCK:*  No further questions.

20           *THE COURT:*  Cross-examination.

21           *MR. FUNK:*  No, Your Honor, thank you.

22           *THE COURT:*  Okay, thank you very much, you may step

23   down.

24           *THE WITNESS:*  Thank you, Your Honor.

25           *MR. PEACOCK:*  Elizabeth Perry, Your Honor.

1           *THE COURT:*  Okay.

2           (Witness sworn).

3           *THE WITNESS:*  My name is Elizabeth Perry, P, as in

4    Peter, E-R-R-Y.

5                      **DIRECT EXAMINATION**

6    *BY MR. PEACOCK:*

7    *Q.*  Mrs. Perry, pull that microphone down to make yourself

8    comfortable.

9    *A.*  Thank you.

10   *Q.*  Mrs. Perry, do you know Michael Harding?

11   *A.*  Yes.

12   *Q.*  How do you know him?

13   *A.*  He is my nephew.  He is my niece's son, he is my grand

14   nephew.

15   *Q.*  Have you known him all his life?

16   *A.*  Yes.

17   *Q.*  Have you known him since -- have you known his mother all

18   her life?

19   *A.*  Yes.

20   *Q.*  So, are you aware of the fact of his father being murdered?

21   *A.*  Yes.  His mother was living with me at the time in New

22   York, at the time, and actually she was staying with a

23   girlfriend the night his father was murdered, and she called me

24   at one o'clock in the morning.  I was well aware of it, went to

25   the funeral.

1    Q.   Were you working when you were in New York?

2    A.   Yes.

3    Q.   What is your occupation?

4    A.   I was an actress, theater mainly.

5    Q.   And you have been an actress for your career?

6    A.   All my life.

7    Q.   All right.  Now, at some point, Julie Harding left and

8    moved back to Hollywood, Florida?

9    A.   Yes.

10   Q.   Did you stay in touch with Julie?

11   A.   Always.

12   Q.   Did you stay in touch with your sister?

13   A.   Very much.

14   Q.   Okay.

15        Are you comfortable in describing the family situation from

16   the time of Michael's birth up until now?

17   A.   Oh, yes.

18   Q.   Okay.

19        When Michael was an infant, what was your observations

20   about how Julie Harding was raising him?

21   A.   I was always worried.

22        I visited as often as I could when she moved to Florida.  I

23   kept up with them from New York until 2000, when I moved down

24   here and I spent more time with them.

25        I was concerned because I knew Julie had problems and was

```
 1   not home as much as she would like to be, and as much as the
 2   boy needed his mother.
 3       I was comforted by the fact that he had a grandmother and
 4   grandfather who loved him very much and could pick him up and
 5   give him times of enjoyment, but I was concerned.
 6   Q.  When you said Julie had problems, what specifically were
 7   you referring to?
 8   A.  Well, as she said, she had a drug problem, drug and
 9   alcohol.
10   Q.  Was that a concern shared by the other members of your
11   family?
12   A.  Yes.
13   Q.  Did you all try to do what you could to assist her in
14   raising Michael?
15   A.  Anything we could, yes.
16   Q.  Are you aware there were frequently times when he was left
17   with other people, nonfamily members, for days at a time?
18   A.  Yes, I was aware of that and worried.
19   Q.  Do you know if there were efforts to intercede on the part
20   of members of the family?
21   A.  All of us, all of us tried to help with the drug problem,
22   guide her to help, to resources for help, and everyone tried to
23   help the boy, but, you know, you couldn't be there every
24   second.  We were all worried about him.
25   Q.  In your opinion, was he a lonely child?
```

1    *A.*  I felt he was a lonely solitary child.

2    *Q.*  Were you able to spend time with him as he was growing up?

3    *A.*  Yes, not as much time as I wished to, because I enjoyed

4    being with him.  On my visits, I would spend time with him.  We

5    had some private times, too, I would take him to the store or

6    whatever.

7    *Q.*  How did he feel about never knowing his father?

8    *A.*  Well, it was not something we discussed at any length

9    because I never knew how much he knew.

10       His father was murdered.  I didn't know if he knew in the

11   way which his father had died.

12       I do recall the first time I was aware of the depth of his

13   sadness was when we were alone, sitting on the beach, and I

14   think he was not quite three, but he could talk.  We were

15   sitting very quietly and all of a sudden he said, my daddy is

16   dead.

17       And I hesitated, and I said my daddy is dead, too, but I am

18   luckier than you are, because I got to know my daddy.

19       He was very quiet, and he looked up at the sky and he said,

20   my daddy is up there with the angels.  It was very sad.

21   *Q.*  Did you see that sadness expressed in other ways by Michael

22   over the years?

23   *A.*  Yes.  I can't quote any explicit times, but I was aware of

24   how sad he was.

25       My sister's husband, his grandpa, substituted in a way for

1    his lack of a father.  My sister and her husband were often

2    with him, helping him as much as they could to have a good,

3    normal, happy childhood.

4    Q.  Now, when you heard about these charges, did that take you

5    by surprise?

6    A.  Very much so.  It has been a shock to all of us.

7    Q.  And is it totally out of character for what you know of

8    Michael?

9    A.  Absolutely.

10   Q.  Do you feel that Michael has redeeming qualities?

11   A.  Michael through all his childhood was always intelligent,

12   respectful, loving, kind.

13       I have never seen any cruelty in him.  He is gifted at this

14   time in his life.  I am well aware of what a good writer he is

15   and how he wishes to educate himself further.

16       He is profoundly sad and in the effort within his

17   situation, he is trying very hard to restore himself, to

18   rehabilitate, and I believe he can.  I am praying for all the

19   help he can get to recuperate within himself, regain his

20   self-respect and find a way to forward himself whatever the

21   situation.

22       I believe he is a wonderful person and I believe that that

23   other aspect of him is completely arbitrary to who he is, and I

24   believe Ashley's first impression of him when she met him was

25   the correct one.

```
 1         I think this is an aberration, and I would love to have him

 2    have some kind of rehabilitation.

 3              MR. PEACOCK:  Very well.  Thank you, ma'am.  Thank

 4    you, Your Honor.

 5              THE COURT:  Thank you.  Any further questions?

 6              MR. FUNK:  No, Your Honor.

 7              MR. PEACOCK:  You can come down.

 8              THE COURT:  You may step down.

 9         Does that conclude defense's evidence?

10              MR. PEACOCK:  Yes.

11              THE COURT:  Government?

12              MR. FUNK:  Yes.

13              THE COURT:  At this point, the Court will entertain

14    defense argument and the Government.

15         I know the defense filed a motion for downward

16    variance.  You can incorporate the argument of the motion into

17    any argument on behalf of the Defendant, and, of course, Mr.

18    Harding has an opportunity to address the Court as well if he

19    wishes to do so, although not required to.

20              MR. PEACOCK:  Do you want me to proceed, Your Honor?

21              THE COURT:  Yes.

22              MR. PEACOCK:  Your Honor, I would like to elaborate on

23    some of the arguments on the motion for downward variance.

24              THE COURT:  Okay.

25              MR. PEACOCK:  These guidelines before Your Honor are
```

1    the tail wagging the dog.

2            The guidelines that are driving the calculation are

3    the child porn guidelines, and that is important because the

4    Sentencing Commission has acknowledged that those guidelines

5    are no longer reflective of what the true activity of a child

6    porn defendant is.

7            The Sentencing Commission has acknowledged that the

8    enhancement factors in 2G2.2 are excessive, and that they no

9    longer reflect the true factors which support enhancement under

10   the guidelines, and they encourage Congress to change the laws.

11           As the Court is, I am sure, aware, the Protect Act

12   from 2003 prevents the Sentencing Commission from changing the

13   Sentencing Guidelines with respect to child pornography without

14   Congress' express approval.

15           Consequently, we end up with a guideline range driving

16   the total offense level just from the child porn guidelines.

17           Arguably, the much more serious counts involve the

18   production and enticement, which have a lower guideline range

19   than the child pornography guidelines.

20           For that reason, it is clear that this guideline

21   computation is arbitrary, and does not reflect the conduct of

22   the Defendant in this case.

23           Secondly, Your Honor, as the Court is well aware,

24   under 3553(a), this Court must also evaluate the

25   characteristics of the Defendant in arriving at an appropriate

1    sentence.

2              I suggest to you that while the crime is indeed very

3    serious, and even reprehensible, Mr. Harding, on the other

4    hand, has demonstrated some very redeeming characteristics

5    which should mitigate this Court's sentence under these

6    circumstances.

7              As I pointed out in my memorandum, Mr. Harding, as we

8    just heard, grew up without a father, never knew his father.

9    His father was murdered before he was born.  He basically

10   raised himself much of the time, Your Honor.

11             His mother was trying to do the best she could.  She

12   had a severe drug addiction and alcohol addiction.  She worked

13   as a cocktail waitress in strip bars, often times not home for

14   several days in a row, and Michael was passed off to friends,

15   whoever could take him, and when he got older, he took care of

16   himself for days at a time.

17             He did not have a male figure in his life and, quite

18   frankly, he didn't have a total mother figure in his life,

19   either.

20             Now, I'm not here to belittle Julie Harding, she has

21   been incredibly supportive of him.  I understand how much she

22   loves him, but the truth is the truth.  This guy didn't have

23   much growing up, didn't have those characters in his upbringing

24   that would teach him the difference between right or wrong.

25             Somehow, though, even after dropping out of high

1   school in the middle of 12th grade, Michael Harding redeemed

2   himself in many ways.

3        He got his GED at Indian River State College.  He

4   enrolled in criminal justice there, he received the degree

5   early, went the to the Police Academy at the same time,

6   graduated, became a police officer, and ultimately became

7   police officer of the year in Ft. Pierce because of his

8   outstanding contribution to society.

9        He has done a lot of good for a lot of people.

10       That doesn't forgive him for what he has done in this

11  case, but it does mitigate to a large degree what he has done

12  in this case, which we're not talking here about a sentence of

13  probation or five years or whatever.

14       I know the sentence is going to be long, I know that.

15  We are talking about the difference between life in prison with

16  no chance at redeeming one's self or a term of years where,

17  somewhere down the line, he could possibly get out and redeem

18  his life.

19       We heard from Dr. Brannon that the risk assessment

20  falls way off after somebody is 55.  We also know in the

21  Federal prisons there is very good, very high quality sex

22  offender treatment, and so he has these options.  He has this

23  ability to take advantage of these.

24       What we are asking is that at some point Your Honor

25  allow him to be able to rejoin society.  We are not asking you

1    for some minimal sentence, I realize that is not realistic, but

2    we are asking you for a sentence that at some point allows him

3    to rejoin society.

4           I have tried throughout this case -- as the Court

5    knows, there is a State case pending, and I am assuming the

6    State will proceed with it immediately after he is done with

7    this.

8           I have tried all the way back to pretty much the

9    inception of the case to get some sort of joint resolution, but

10   that has not been accepted, and that is fine.  That is the

11   Federal Government's and State Government's prerogative, but it

12   is not lack of Mr. Harding trying to do so.

13          One thing that does concern me is that if Your Honor

14   gives him life in prison, in this instance that will make a

15   trial in the State case a foregone conclusion.  That means a

16   trial will definitely happen in the State case.

17          I think that is something that people need to think

18   about very carefully.  It won't be a pleasant trial.  It will

19   be ugly, and that is just the nature of those charges, and C.W.

20   and H.W. will have to testify probably more than once, I would

21   think.

22          I hope that people have thought this through when they

23   are asking for a life sentence, because if Mr. Harding gets

24   life here, there will be no reason to make any kind of

25   concession once he gets to State Court, and I think that is an

```
1    important consideration.

2              Your Honor, I want to make sure I am not missing any

3    points.

4              For those reasons, Judge, we ask that you reject the

5    sentencing guideline.  We ask you make a variance down from the

6    360 to life guideline range, which I believe is a one level

7    reduction, unless I am incorrect.

8              Is that correct, Mr. Cooley?

9              It would be a one level variance, and I ask you to

10   sentence him at the low end of the guideline range.

11             I believe Mr. Harding does want to make a statement to

12   the Court.

13             THE COURT:  Okay.

14             MR. PEACOCK:  If I may have one minute with him.

15             THE COURT:  Yes.

16             MR. PEACOCK:  Do you want me to do that now or after

17   the Government?

18             THE COURT:  He can do that now and I will have Mr.

19   Harding sworn and we can turn it over to the Government.

20             MR. PEACOCK:  Yes, ma'am.

21        (Thereupon, the defendant was duly sworn.)

22             THE DEFENDANT:  Good afternoon, Your Honor.

23             THE COURT:  Good afternoon.

24             THE DEFENDANT:  Looking back at my life, I am not sure

25   how I made it as far as I did.  I never knew the love of a
```

Pauline A. Stipes, Official Federal Reporter

```
 1    father because he was tragically murdered before I was born.

 2            As a single parent, my mother gave her best effort to

 3    support us.  Despite working two jobs, we found ourselves

 4    living in poverty.

 5            From my earliest recollections, my mother struggled

 6    with her own demons in the matter of drug abuse which she

 7    battled for many years.

 8            It wasn't uncommon for me at an early age to find

 9    myself alone unsupervised for a night or even a weekend.  I

10    would be left with the responsibility of taking care of myself

11    and when my mother would eventually return home, often times I

12    would take care of her as well.

13            On other occasions, I would spend the night with a

14    babysitter or I would be taken to a friend's house with a

15    sleepover.

16            It was during some of the sleepovers that my friend's

17    older brother would sexually molest me, while other times my

18    friend's parents would sexually abuse me.

19            Excuse me.

20            His parents would abuse both of us, and have us

21    perform sexual acts on each other.

22            Yet, in spite of my precarious upbringing, I was able

23    to overcome that, and I was extremely proud of the life I was

24    building.

25            My world was filled with a loving family and generous
```

Pauline A. Stipes, Official Federal Reporter

1   friends.  I was truly blessed, and I was excited to see what my

2   future had in store.

3         Of course, however, my life has been irreparably

4   damaged due to my own actions.

5         I deeply regret every picture and video I ever viewed

6   or possessed and my heart breaks truly for each victim who was

7   harmed and ultimately exploited as a result of that material.

8   I am continually stricken with intense feelings of guilt,

9   shame, regret and remorse because of my selfish behavior.

10         The situation has caused untold amounts of pain and

11   grief to my dearest family, to my wife and all of her family

12   and to every one of my friends and my community.

13         I pray that one day I may be afforded the opportunity

14   to make amends to those people my decisions have affected.

15         Finally, Your Honor, I humbly ask you that the Court

16   may show mercy so that one day many years from now I may be

17   given a second chance at life in order to redeem myself.

18         Thank you, Your Honor.

19         *THE COURT:*  Thank you.

20         Okay, Government.

21         *MR. FUNK:*  It's a remarkable thing to step into the

22   world the Defendant lived in, to see the pictures that he

23   sought for the gratification of himself as well as others, to

24   see the videos and the moving words of victims that are in the

25   videos, and read the chats and the words of the Defendant, as

1    well as the other offenders, to know what they think, what

2    satisfies them, what their desire might be.

3           The most troubling thing aside from -- obviously, the

4    videos are shocking, but the ultimate indifference and lack of

5    empathy they have for the children.

6           There are statements that the Defendant made about

7    braking the hymen of a nine year old and how once that was

8    done, you could have intercourse with her.

9           There are statements in there, videos you saw where

10   clearly there is a sex toy getting forced into a young girl who

11   is eight or ten years old.  There are things you can't get out

12   of your head by looking at them.

13          We have the luxury, you do and I do, of turning it

14   off.  Still it is hard to get out of your head.

15          You have to imagine the experience surrounding those

16   videos, images.  We see the still image of a young girl who is

17   hog tied, and it is shocking.  I ask:  Why in the world would

18   something like that happen?  You are able to hear that or read

19   it in the text messages of the Plaintiff.  Quite plainly, he is

20   sexually gratified by seeing things like that.

21          The gratification and motive to do this isn't in and

22   of itself wrong, it is the choice he has to know that it is so

23   wrong, that it is illegal.  It is that indifference to their

24   suffering, to the standards we have as society, that is what is

25   so wrong about this case, and what is so wrong about the

1    actions of the Defendant.

2              You have to have empathy for the victims.

3              From the standpoint of the victim, you can only

4    imagine when he is left to take care of a nine year old girl

5    and she knows at that moment she is at home alone with him, he

6    is going to take his clothes off and he is going to try to have

7    sexual contact with her, how out of control she must feel, how

8    deceived she must feel.

9              As you read in the victim statements, the children

10   depicted in the videos and still images, how out of control to

11   control someone so precious to themselves, so intimate to their

12   being, the disgust they must feel, the dread they must feel,

13   the lying they know that goes on to family members,

14   manipulation of the Defendant to get them to lie to family

15   members.

16             To compare those memories to those of good memories of

17   childhood, some people are so fortunate to remember things like

18   a trip to Orlando, to go to the Magic Kingdom in Orlando.

19             That wasn't the trip that Michael Harding intended for

20   C.W. to go on.  It wasn't for her, it was for him.  As much as

21   he was responsible for caring for her and protecting her, what

22   Ashley Harding expected him to do because he was a law

23   enforcement officer, the trust she had in him, he violated

24   that.

25             I still can't figure out why someone who is upset and

Pauline A. Stipes, Official Federal Reporter

1   cries and shows emotion at being the victim of abuse would have

2   so much lack of empathy for the girls in those videos and for

3   his own stepdaughters.

4        How he would continue to violate the law by

5   transmitting those images, by perpetuating this sort of

6   gratification other people get from this is morally wrong.  I

7   don't know the answer to that.

8        I do know he is well aware of what the law is.

9        You see in those chats he talks about people getting

10  caught, talks about them going away.  He shows how he is upset

11  that someone can no longer produce those images that you saw.

12  We showed the mastodon video, that is the video where another

13  person says, God bless mastodon.  He is up to date and keeps

14  track of whether or not that person has been incarcerated.

15       The specific offense characteristics are as

16  aggravating as they could possibly be.  These images are

17  unmistakably child pornography.

18       There are some cases where you see a person who comes

19  in in their mid 20's, and they have a 15 year old, the 15 year

20  old is in a somewhat suggestive pose, sometimes it is hard to

21  call.  Maybe they are too old, it is not sexual, there is a

22  border.  In this case, there is no question when you look at

23  the images, and no question in the mind of the Defendant when

24  he was looking at them, that they were prepubescent children

25  being victimized.  They are sadistic.

1          His acts against his own children are sadistic in the

2     manner which they are carried out because of their small frame,

3     the objects that are inserted into them, that is sadistic.

4          The amount of images is remarkable.  Cataloging the

5     images is remarkable, the type of images.

6          He has been looking at the images for over eight

7     years.  They involve all kinds of sex acts, and for someone who

8     has not seen it before, you can only describe it as hard core

9     pornography with a five year old.

10          He uses the computer.  Sometimes defense counsel make

11     an issue of the use of the computer, the anonymity.  Had it not

12     be for Brian Rey and Homeland Security Investigations, and but

13     for a couple of mistakes on the Defendant's part, he would

14     still be doing this today.

15          I don't think you can look at the chats without

16     knowing that to be true, that the abuse stopped to the children

17     and viewing the distribution of pornography stopped the day he

18     was arrested.  There's nothing in the chats or anywhere else

19     indicates he was going to stop what he was doing.

20          The computer gives him the ability to do that.

21          There is tour browsers, the Defendant refers to the

22     dark web, pseudonyms, Drop Box, he has an extensive collection

23     and he is willing to share.

24          For over four years he participated in a pattern of

25     behavior of sexual abuse against his own children, the ones

1    that Ashley Harding entrusted him to take care of.

2              He had the ability to control his urges.  He had the

3    ability to not be caught but for the two mistakes that he made.

4              I am reluctant to say what those are, only because I

5    know there are other people out there.

6              They may not be in the courtroom today, but to have

7    that information out there, some day there will be a dark web

8    that is so dark that law enforcement won't be able to find the

9    people who abuse children.

10             The only deterrence comes from sending a message, a

11   general deterrence to the community to know they face life

12   imprisonment, to give them the fear that Brian Rey is sitting

13   on a computer in a chat room where they exchange pornography to

14   know that that boogie man is going to be there to hopefully

15   convince them they should not be doing these unlawful acts.

16             Look at the general characteristics in sentencing.

17   This is not isolated, this is calculated, premeditated,

18   sophisticated.

19             His remorse in light of all the chats that you see can

20   only be characterized as regret for getting caught.

21             He caused harm to the children in his life.  He caused

22   emotional harm to the children portrayed in the pornography in

23   a way that he perpetuated that sort of victimization.

24             As you saw on the victim impact letters, those

25   experiences forever will live on for the gratification of other

1    people.

2            He goes so far in encouraging other people to offend

3    that when someone asks him or remarks to the effect of how

4    lucky he is, he has children in the house to abuse, he

5    encourages that other person to go out and find a single mother

6    of his own.

7            He says you should get a little girl of your own to

8    train, it is the most amazing experience.  There are thousands

9    of single moms out there, go for it.

10           The other person asks, what age should I start?  He

11   said, five, it worked for me.

12           He obviously harmed his wife, his marriage, his

13   new-born child who is going to be without a father.

14           He is, and you will look and see that in the chat

15   messages, he is the initiator about the child swapping.  It's

16   not an idea he indulged that someone put forward; it is an idea

17   he put forward to other people.  There are at least two chat

18   conversations where he mentions that.

19           One is where he ended up getting charged with

20   enticement.  In that they carry on in two separate and distinct

21   conversations, the first one is graphic, sexual, meant to

22   arouse and gratify each other in the conversation.

23           The second part of it is cold and calculated,

24   nonsexual, how they are going to meet, what their plan is for a

25   cover story.

1          They exchange images, discussions about trust, phone

2     conversations.  We don't have phone conversations, but you can

3     see them referred to in the chat messages.

4          That is indifference to the feelings of C.W., so

5     incredibly indifference.

6          He deserves to be treated with that sort of

7     indifferences, what is his just desserts as far as the pain he

8     caused other people.

9          In a way to serve justice is the Court to -- it can't

10    fall on completely deaf ears the fact that he has had

11    difficulty in his upbringing, but when some things are so wrong

12    and they are so indifferent to the suffering of other people,

13    he does not deserve -- it is not just to listen to him.

14          Over 90 victims in this case, from 20 countries around

15    the world, on some days were at home when their offender came

16    in the room or someone was away and had to deal with the

17    prospect of engaging in these acts.

18          He has no sympathy for them.  In fact, it is

19    interesting to see in these images there is never a perspective

20    of the victim.

21          You have a point of view or perspective for the

22    offender, as you saw on the videos, where some child is sitting

23    on top of him, or you have this voyeuristic viewpoint.

24          The very least they ever talk about in the chats is

25    the sexual gratification that the children may have, which at

Pauline A. Stipes, Official Federal Reporter

1    the very best, is just remarkably callus to think that a child

2    who says no, I don't want to do that, or that smells, I don't

3    want to do that, to think that in some way is doing something

4    good for them is just, just unbelievable.

5             He went beyond in the distribution of the pornography

6    to encourage other people to produce pornography so they could

7    exchange it.

8             He had high regard for child pornographers.  He knew

9    about the different child pornographers, the different series

10   of what they produced.

11            Now, the discussion, it does not follow, absolutely

12   does not follow that the Court should take into consideration

13   the State Court case.

14            This is your decision to make.  It is for you to

15   decide, and if you impose a life sentence, there is no logical

16   consequence of how that is going to necessarily effect the

17   resolution of the State case.

18            His risk is high.  From all the different types, all

19   the aggravating factors of the types of pornography, hands-on

20   offending that he did, Dr. Brannon, their own expert, says

21   those are factors that will contribute to his risk of

22   reoffending.

23            Incarceration is deprivation of pleasure.  You

24   sentence victims to deprivation of pleasure for life.  In

25   relationships, memories, he did one of the greatest moral

```
 1    wrongs, to cause harm to your own stepdaughter, to cause her to
 2    be abused by someone else for your own sexual gratification.
 3            People talk about using another person for a means to
 4    an end.  What could possibly be worse than offering up your own
 5    child that is entrusted to you to have sex with some random
 6    person?
 7            The 3553 factors require a sufficient sentence but not
 8    greater than necessary to address all the factors.  The
 9    sentence needs to be sufficient but not greater than necessary.
10            There is a calculation, the calculation is life.
11    While the Court is not bound by that because you do have your
12    discretion, there is no reason to vary from that guideline
13    range.
14            There is no factual reason, there is no legal reason,
15    there is no moral reason to sentence him to anything but life
16    in prison.
17            Regardless of the guidelines themselves, all the
18    aggravating factors in this case support a term of life
19    imprisonment.
20            He should spend the term of life.  He should have a
21    deprivation, in reference to the age of the children, that will
22    actually be less of a time period than what he subjected them
23    to.
24            These children, five years old, nine years old,
25    hands-on victims, have the remainder of their life, the
```

1    pleasure they may have in their relationships, living with

2    anxiety, memory of the loss of control.  He deserves to get

3    life because it is right, it is just and because all the facts

4    in this case support that sentence.

5         Thank you.

6         *THE COURT:*  Anything further from defense?

7         *MR. PEACOCK:*  Yes.

8         Your Honor, that might be have been compelling if

9    there weren't guidelines in this case.

10        There are Sentencing Guidelines in this case that were

11   promulgated by the United States Sentencing Commission.  It is

12   widely accepted the guidelines on child pornography and child

13   sex sentences are extremely harsh.

14        Mr. Funk made no mention whatsoever of the Sentencing

15   Commission 2012 report on child pornography guidelines.  He

16   totally avoided that.  And then he had the temerity to stand

17   here and tell you there is no legal reason why the Court should

18   not vary downward.

19        The Sentencing Commission itself said the Sentencing

20   Guidelines are too high.

21        We are not asking you to make a wholesale variance

22   downward.  We are asking for one level in light of the

23   Sentencing Commission saying these guidelines are not well

24   founded.

25        *THE COURT:*  To be clear, the report speaks to child

```
 1    pornography only, and not to the other aspects of this

 2    Defendant's case, enticement, sexual aspects of the children.

 3    I want to be clear on that.

 4            MR. PEACOCK:  It also encompasses other sex offenses,

 5    those offenses concerned with the Protect Act of 2003.

 6            THE COURT:  You are saying the 2012 report that speaks

 7    to the guidelines as being too high speak to the kind of

 8    offenses that we have in this case separate from the child

 9    pornography?

10            MR. PEACOCK:  No.

11            THE COURT:  Just the child pornography.

12            MR. PEACOCK:  The point I am relying on speaks to the

13    child pornography sentences that are too high.

14            The Commission has not said the enticement or

15    production guidelines are too high, but they are lower in this

16    case than the child pornography guidelines are.

17            Mr. Funk must have spent 15 minutes talking about the

18    enticement part of this case, and that is important.  I'm

19    not -- it is reprehensible.

20            We are not arguing that.  We are way past more than

21    half of what he argued to this Court.

22            As reprehensible as the enticement charge is, the

23    guidelines are lower than the child pornography guidelines.

24            He did not mention that because he is going to ask the

25    Court for an upward variance.  Because he has the out of fact
```

1    child pornography guidelines, he doesn't have to do that.

2            The guidelines take into account the parent, a person

3    with custody.  That is not something that fell through the

4    cracks, that is taken into account in the guidelines.

5            This is not a sophisticated offense.  Mr. Harding does

6    not have an unusual amount of child pornography.  In my

7    experience, he's somewhere in the middle in that regard.

8            He doesn't have any kind of file sharing or whatever,

9    he is in his chat room.

10           It is pretty clear what he is doing.  As soon as this

11   agent sees him in Delaware, he knows what he is doing.  It took

12   about two days to figure out who he was and where he was.

13           And last, Judge, the State case is important.  I think

14   it is extremely cavalier of the Government without much

15   forethought to put these little girls in that position, because

16   I do seriously suggest that if Mr. Harding receives a life

17   sentence there will be no motivation whatsoever for him to

18   resolve the State case.

19           Yes, okay, the State could dismiss its case.  Knowing

20   this circuit, I honestly don't see that happening.  And that is

21   a very serious matter because they would have to go through

22   deposition, they would have to go through testimony at trial,

23   they would be at an age where that would be incredibly

24   difficult, and that would be very unfortunate.

25           I think that is going too far to get the pound of

```
1   flesh, and I think that a term of years is going to be more
2   than you need to satisfy this Court's concerns in this case.
3   Thank you.
4              THE COURT:  Okay, thank you.
5              Okay, has everyone been heard?  Defense have you been
6   heard in full?
7              MR. PEACOCK:  Yes.
8              THE COURT:  Government?
9              MR. FUNK:  Yes.  Thank you.
10             THE COURT:  We will take a recess.  And I would say
11  stay close by, I can't tell you how long the recess will be.
12             It could be longer than half an hour, but not longer
13  than an hour, and we will return.
14         (Thereupon, a short recess was taken.)
15         (Thereupon, trial reconvened after recess.)
16             THE COURT:  Okay, please be seated.
17             We will wait for the Defendant.  Okay.
18             We are now at the stage of the proceeding where the
19  Court is going to pronounce the sentence.  The Court has
20  considered the statements of all parties, the Pre-Sentence
21  Report which contains the advisory guidelines and statutory
22  factors set forth in 18 United States Code, Section 3553(a).
23             It is the finding of the Court that the Defendant is
24  not able to pay a fine.
25             The 35353 factors include subsection A, the factors to
```

1    be considered in imposing a sentence.  The Court shall impose a

2    sentence sufficient but not greater than necessary to comply

3    with the conditions set forth in paragraph two of the

4    subsection.

5           The Court in determining the particular sentence shall

6    consider, one, the nature and circumstances of the offense and

7    history and characteristics of the Defendant; two, the need for

8    the sentence imposed, A, to reflect the seriousness of the

9    offense, promote respect for the law and provide just

10   punishment for the offense, supply adequate deterrence of

11   criminal behavior, protect the public, and provide the

12   Defendant with needed training and care in the most effective

13   manner.

14          Three, the kinds of sentences available; four, the

15   kinds of sentence and the sentencing range established for the

16   applicable category of the offense committed and the applicable

17   category of defendant as set forth in the guidelines issued by

18   the Sentencing Commission 994(a)(1), Title 28 United States

19   Code.

20          The Court is also to consider any pertinent policy

21   statements issued by the Sentencing Commission pursuant to

22   994(a)(2), Title 28 United States Code, subject to any

23   amendment made by the policy statement by an act of Congress

24   and the need to avoid unwarranted sentence disparities with

25   similar records who have been found guilty of similar conduct

```
 1    and the need to provide restitution for any offense.
 2              Those are the guidelines and factors the Court must
 3    consider in considering the appropriate sentence to impose on
 4    Michael Harding here today.
 5              First, the Court is going to summarize the evidence
 6    that it has heard and considered in its consideration of the
 7    sentence today.
 8              We have all of the documentary evidence that has been
 9    admitted into evidence, which includes Exhibits 1 through 15 of
10    the Government.
11              In addition, the Court has considered the Docket Entry
12    103, notice of filing the victim impact statements and the
13    exhibits, which I believe also appear on the exhibit list, but
14    those that appear at Docket Entry 91.2, the chat conversations
15    which appear at Docket Entry 91.2, as a sealed exhibit.
16              The Court heard testimony from a number of witnesses.
17    The Court heard testimony from Sheila LaGrega, assigned to the
18    criminal division of the Port St. Lucie Police Department,
19    investigates persons crimes, including sexual batteries.
20              On 9/22/15, she became involved in allegations of
21    sexual abuse of C.W. and H.W. and was asked to conduct
22    interviews and met with the mother, Ashley.
23              During the first interview, C.W. said the Defendant
24    had asked her to put his hand on his penis and wanted her to
25    take off her clothes and lay with him naked.  His clothes were
```

1    off and he put her hand on his penis and move it around.  She

2    did not do that.  This occurred in the living room and bedroom

3    in their house.

4         On 9/29/15, C.W. was interviewed again, still

5    uncomfortable.  Ms. LaGrega gave her note paper and dolls to

6    make things easier.  C.W. disclosed she would be in the living

7    room and the Defendant, Mr. Harding, would take his clothes off

8    and put a blanket over him.  She did not say anything because

9    she thought she would get in trouble.  He moved her hand over

10   his penis.  He had tissues and Mr. Harding used them to wipe

11   himself off.

12        She said he touched her on her privates and her butt,

13   and digitally penetrated her vaginally and anally, put her

14   mouth on his penis.  She said something came out.  He put his

15   penis in her privates a "few times" and she said it hurt.  She

16   said he did it a little bit.  She put her hand on his penis.

17   Mr. Harding would have her move her hand and around what came

18   out went on her hand went on her hand.

19        He penetrated her anally with his fingers and she said

20   it happened a few times.

21        H.W. spoke about sleeping in a tent with the

22   Defendant.  He took his clothes off and her clothes off.  He

23   told her to lay down or he would smack her.  He came into the

24   tent with a screwdriver, hammer and silver knife.  He put the

25   handle portion of the screwdriver into her vagina and butt.

```
 1    She said he took pictures of her in the tent and said he was
 2    going to show Ashley Harding.  H.W. said she was scared.
 3         The witness testified about other things, but these
 4    are pertinent parts the Court has taken note of, as it has of
 5    the other witnesses.
 6         The Government presented Danitza Byrd who works for
 7    the Port St. Lucie Police Department crime scene unit, and was
 8    involved in the investigation and she took swabs from C.W. and
 9    H.W.
10         Special Agent Brian Rey testified, he works for the
11    Department of Homeland Security, and he issued subpoenas and
12    search warrants.  He did a forensic exam of the Defendant's
13    electronic devices, did a search of the residence, found the
14    gun with the case and sex toys and a thumb drive which he was
15    authorized to take as part of the warrant.
16         He found chat messages from the phone conversation
17    view.  Images of C.W. were transmitted that were not disclosed.
18    One was a Skype portion of the chat.  It is an image that was
19    modified to include a side-view of C.W., and there was a quote
20    along with that, "that's my elbow and her sweet ass."
21         Special Agent Rey found the full image.  That image
22    was presented to the Court, it was of C.W., and an additional
23    image was sent of C.W. in the living room.
24         Special Agent Rey informed the Court through his
25    testimony about the known offender Mastodon and a series of
```

1   child pornography produced to entertain others, the April blond

2   series, the Tara series.  He explained the chats occurred over

3   a period of time from 3/25/15 to 9/22/15, approximately 70

4   separate chat sessions, and yet these were only a small number

5   provided to the Court.

6        Images were sent to the National Center of Missing and

7   Exploited Children of all of the images submitted,

8   approximately 94 separate series, 94 separate victims, 94

9   separate offenders.  20 separate countries including the U.S.

10  represent where the images came from.

11       One of the earliest images was from March 6, 2008,

12  that was found on Mr. Harding's electronic devices.  There were

13  other images and videos that covered a time from 2008 through

14  the date of the seizure.

15       He found an image of C.W. on the telephone, the LGD

16  800 cell phone.  The video had been created and this was a

17  thumb nail image created from the video.

18       Special Agent Harding spoke about the drop -- Special

19  Agent Rey spoke about how Mr. Harding used the Drop Box to view

20  child pornography, how he organized the child pornography, how

21  he categorized the child pornography, kept it on the thumb

22  drive, had a folder called Kik.  Videos were created on the

23  phone, and he posted videos on the Kik website.

24       He reviewed sexual child exploitation material, that

25  is, Special Agent Rey, with the Government counsel to select

1   certain demonstrative images which were shown to the Court and

2   viewed by the Court, and they all appear at Exhibit 11, and all

3   of the subsections of Exhibit 11 which the Court viewed in

4   camera with counsel in the courtroom.

5           Exhibit 12 reflected the printout of the chat rooms

6   and the Kik application that indicated Mr. Harding had joined

7   chat rooms.  And the Kik room that he was in came under the

8   name hash tag toddler fuck.

9           There is a list of all of the chat rooms that Mr.

10  Harding joined, all of which have been presented in court.

11          Ms. Ashley Harding testified next with respect to

12  questions that had been raised about Mr. Harding's drug

13  addiction that were put into evidence by Dr. Brannon, and the

14  Court will get to Dr. Brannon in a moment.

15          It was Ms. Harding's observation that the Defendant

16  took certain prescribed drugs, Klonopin and hydrocodone, that

17  he took them in a way he was supposed to, to the best of her

18  acknowledge and observation.  She did not feel he was abusing

19  prescription drugs or alcohol.

20          She spoke about an almost perfect relationship that

21  she thought she had with Mr. Harding until the baby was born

22  and noticed distance in the relationship beginning at that

23  period of time.

24          She trusted him, she trusted him as a husband and as a

25  father to her two stepchildren, who called Mr. Harding dad,

1    and, of course, spoke about his position in the community as

2    one of a police office in which the community ought to be able

3    to have trust and respect.

4              Ms. Harding did talk about the tent that has been the

5    subject of testimony and evidence in this matter, that he would

6    do camp outs with the girls.  C.W. spent the rest of the night

7    in the tent, and H.W. would come in.  Only on one occasion did

8    C.W. not stay the whole night.

9              They did share a computer, although Mrs. Harding was

10   made to understand that Mr. Harding's phone was off limits

11   until he could manipulate it, presumably to prevent

12   Mrs. Harding from seeing things on the cell phone, which we

13   have come to learn that is where some of the images were

14   stored.

15             On 9/22/15, the day of the arrest, Mr. Harding told

16   Mrs. Harding that he never hurt the children and that he loved

17   them and her and he would never do anything to hurt her.

18             He had about five guns in the house.  They were all

19   taken to her parents' house.  The children were very upset when

20   they learned what happened to their father, that is not their

21   biological father, but the person they have come to know as

22   dad, Mr. Harding.

23             When Mrs. Harding took C.W. into the room, she said

24   she felt uncomfortable around Mr. Harding all the time, and

25   became hysterical.  She described a few of the things she did

```
 1    with Mr. Harding and she had been afraid to tell her mom in the
 2    past.
 3            At the time of Mr. Harding's arrest, C.W. was five,
 4    H.W. was nine, and Mrs. Harding spoke to the Court about some
 5    of the things that C.W. and H.W. told her that Mr. Harding had
 6    done to them, which was consistent with the testimony that
 7    Sheila LaGrega gave the Court and what she learned through her
 8    interviews with C.W. and H.W.
 9            The Court heard from Wayne Walker, who is from the
10    Indian River Crime Lab, and he spoke about examining certain
11    pieces of evidence, including the sex toy and blanket submitted
12    for examination.
13            With respect to the sex toy, which Exhibit 15 is a
14    photo of the sex toy, he did find a complete DNA female
15    profile.  He developed a profile at all 15 markers, compared it
16    to C. W.'s standard, and he concluded that they matched and
17    they are from the same individual.
18            With respect to the blanket, he did obtain a profile,
19    there were three semen stains.  There was never a standard that
20    Mr. Harding submitted to the lab, but he did provide a profile
21    from the purple vibrator and stains on the blanket, and they
22    were consistent with the same person.
23            Now, Mr. Brannon was qualified to testify.  He did
24    evaluate Mr. Harding to assess whether there are any
25    psychological issues.  He conducted a psychological examination
```

1    on 12/30/15.  He received background forms, psychological

2    testing, spoke to Ms. Harding's mother.  He spoke about the

3    different tests and measures that he used and he ultimately

4    concluded that Mr. Harding reported numerous symptoms of

5    depression and anxiety and indications of possible

6    post-traumatic stress.

7            He did report the chronic and severe abuse of

8    marijuana and alcohol.  The psychological testing, prior

9    treatment records and an interview with Mr. Harding's mother

10   were consistent with Mr. Harding's self-reported symptoms.

11           The test and test scales designed for distortion do

12   not reveal malingering according to Dr. Brannon.

13           He noted if Mr. Harding's self report regarding

14   childhood sexual abuse is accurate as presented, it is likely a

15   contributing factor at the time of his alleged offenses, and

16   moreover, Mr. Harding's apparent addictions to pornography and

17   marijuana likely impaired his judgment and ability to control

18   impulses at the time of the alleged offenses.

19           Based upon information available at the time of the

20   assessment, Dr. Brannon felt Mr. Harding would be an

21   appropriate candidate for weekly counseling sessions and sex

22   offender groups, and he would benefit from participation in

23   group meetings several times a week to address the addiction to

24   drugs and alcohol, and indicated Mr. Harding did not display

25   factors that would prevent him from treatment services as

1    outlined above.

2              Now, Dr. Brannon was really not retained nor did he

3    give testimony specific to Mr. Harding's risk factor and

4    likelihood of reoffending.

5              He spoke generally about persons convicted of sexually

6    abusing children and did say the most salient factor in terms

7    of frequency of engaging in violent and sexual behavior, and

8    the age of 55 is where you see a desistance or drop off in

9    particular sex crimes, and the only exception is if the person

10   has psychopathic disorder.

11             And much was discussed on examination and on

12   cross-examination as to whether Mr. Harding suffers from any

13   psychopathic disorder to suggest that perhaps this 55 year old

14   desistance or drop off might not be applicable as that was

15   simply a general statement, and the Government queried and

16   examined Dr. Brannon on that, and through the examination, Dr.

17   Brannon acknowledged that a number of the factors that were

18   evident -- are evident in this case based on the behavior of

19   Mr. Harding are the kinds of factors that one might see in

20   someone who has a psychopathic disorder.

21             The Court is not reaching any conclusion as there has

22   been no expert ultimate opinion on whether or not Mr. Harding

23   has a psychopathic disorder.  The Court simply raises it and

24   notes that he does include that as an exception to the 55 year

25   old, and a number of the factors that were brought up on

1    cross-examination that would be indications of such a disorder,

2    including interest in younger children, under the age of five,

3    bondage, a primary interest in prepubescent children.

4         Any time there is touching, that increases the risk of

5    reoffending.

6         The offer to exchange children, that is the testimony

7    or evidence that has been put into evidence, evidence that has

8    been put into the record from the chat messages with Mr.

9    Harding.  Communicating with a third person about exchanging

10   C.W. with this other person's daughter for sexual activity,

11   abuse, gratification are also factors, according to Dr.

12   Brannon, that would pose a risk of future reoffending.

13        The fact that the majority -- the quantity of the

14   child pornography is a factor of future offending.

15        Sadistic behavior is an indicator of future

16   reoffending.

17        He spoke about one criteria, anti-social personality,

18   including self direction and goal setting.  He did acknowledge

19   goal setting matches swapping children with another person, an

20   anti-social lack of empathy, remorse for hurting another

21   person.  He said a pattern over four years of child abuse would

22   be a factor contributing to a diagnosis of anti-social

23   behavior.

24        He did acknowledge it needed to be begun before 15

25   years of age, and needed to be a history and pattern, and he

1    was not aware of any -- he concluded there was no indication

2    that Mr. Harding had the inability to appreciate or understand

3    the criminal nature of his offense, and the Court knows through

4    reading the chat messages that Mr. Harding did communicate with

5    others in acknowledging the risks of getting caught.

6            In fact, he, as a law enforcement officer, probably

7    knows that better than a non law enforcement person engaging in

8    these activities.

9            The Court heard from Julie Harding, and Julie Harding

10   is Mr. Harding's mother.  She explained how Mr. Harding's

11   father was murdered before he was born, and described the

12   difficulties she has had in her life and the impact that those

13   difficulties surely have had on Mr. Harding in terms of his

14   upbringing, not having a father, not having a mother most of

15   the time.

16           She was either working two jobs, coming home late, not

17   coming home at all, abusing drugs and/or abusing alcohol.

18           We learned from Mrs. Harding, and from Mr. Harding

19   when he spoke to the Court, Mrs. Harding wasn't aware of this

20   at the time, when Mr. Harding was staying with other friends

21   during these periods when Mrs. Harding was absent, that he has

22   been sexually abused and he was sexually abused by a friend's

23   older brother as well as the friend's parents, and that from

24   the way that Mr. Harding described that, he was emotional and

25   surely the Court can understand that if in fact that occurred,

1   that would have been a very emotional and traumatic experience

2   for Mr. Harding.

3          Despite that, however, and despite having dropped out

4   of high school when he moved to this area in his last year of

5   high school, he seemed to have overcome certain challenges.  He

6   went to the Indian River local college.  He got a degree, went

7   on to get his Associate Degree in criminal justice, completed

8   the Police Academy, did that all at the age of 20 years old.

9          Mrs. Harding was proud of her son, Mr. Harding, as Mr.

10  Harding seems to be proud of those accomplishments.

11         She was not aware of the psychological counseling Mr.

12  Harding sought, but she was aware of anxiety and depression.

13  She did not know he used alcohol and marijuana.

14         We heard from Elizabeth Perry, who spoke of her

15  knowledge of Mrs. Julie Harding and the difficulties and

16  challenges she has had and knowledge of Michael Harding, what

17  he has been through.  She commented that he was intelligent,

18  respectful, loving and kind.  He is sad, trying to restore

19  himself.  Mrs. Perry believes he can, and she thinks his

20  behavior was an aberration.

21         In considering the nature and circumstances of the

22  offense, the Court notes that the Defendant on multiple

23  occasions sexually abused his two stepchildren, C.W. and H.W.,

24  ages five and eight, who were in his care.

25         He also attempted to provide one of those children,

Pauline A. Stipes, Official Federal Reporter

C.W., to another pedophile to be sexually abused for the
purpose of gaining access to innocent children.

      The Defendant, Mr. Harding, intended to sexually
abuse.  In his text messages, he graphically described the acts
he performed on C.W.  On multiple occasions he subjected the
two children to oral and anal sex acts.  The acts were sadistic
both because of the nature of the acts and because the acts
were performed on children of such young age and such small
frames.

      To memorialize his act, he chose to videotape H.W.
performing oral sex on him.  He regretfully erased the video
because he was afraid of getting caught.

      He interacted -- Mr. Harding interacted with other
pedophiles online, he encouraged them to sexually abuse young
children.  The encouragement was accomplished through chat
messaging and distribution of child pornography.  He engaged in
conversation was other pedophiles in which the topic was sexual
abuse committed on prepubescent children.  The conversations
and encouragement demonstrated to other people that he was
accepting, condoning their behavior, and the conversations also
served to arouse the sexual desire of other men to have sex
with prepubescent children.

      Mr. Harding explained and was told by another person
with whom he was communicating that he was lucky because he was
married to a woman who had two children, and was considered

```
1    lucky because of that, because he could perform sexual acts
2    with the children in the home, and appeared to give advice to
3    other offenders or potential offenders or chat room partners
4    how they can go and find single women with children because
5    that would make it easier for them to prey upon innocent young
6    victims.
7            Mr. Harding's distribution of child pornography
8    further victimized the children in the videos.  Images
9    distributed on the internet do have the potential of lasting
10   forever.  The children in the images do live with for the
11   remainder of their life someone is trading for personal
12   gratification images of what has to be one of the worst, if not
13   the worst experiences in their life.
14           The child pornography ranged from offensive to
15   patently disturbing, depictions of the genitals, grade age
16   girls orally and vaginally penetrated with objects, fingers and
17   penises.  Some of the images were purely sadistic.
18           With respect to the history and characteristic of the
19   Defendant, the Court has encompassed that in recounting the
20   testimony of Michael Harding and the experiences that he had
21   growing up and that of Mrs. Julie -- Ms. Julie Harding.
22           That is where the Court has gleaned most of what it
23   could, including the report from Dr. Brannon of the history and
24   characteristics of Mr. Harding.
25           The Court must consider the need for the sentence
```

```
 1    imposed to reflect the seriousness of the offense.

 2            I don't think anyone who has been listening for the

 3    past two days can dispute that Mr. Harding's offenses were of a

 4    extremely serious nature.  I can only hope that Mr. Harding now

 5    realizes that.

 6            The quality and quantity of the harm inflicted by

 7    virtue of the type of sexual abuse inflicted on the

 8    stepchildren and quantity of videos, images, chat discussions

 9    that he received, possessed and distributed all speak to the

10    seriousness of the offense and the need for the sentence

11    imposed to reflect the seriousness.

12            Ms. Ashley Harding left to care -- is now left to care

13    for three children.  The children and their mother are now

14    fearful and untrusting of other people.  For Mrs. Harding and

15    her children to trust another man to be around her children may

16    never happen in her lifetime.

17            The child that you have fathered, Mr. Harding, will

18    grow up now without a father figure.

19            The -- your arrest and conviction no doubt tarnished

20    the perception of law enforcement in the community, and this

21    case and your acts will be in the mind of the public when they

22    see police officers.

23            Now, I did want to speak to the issue that Mr. Peacock

24    has raised with respect to the Sentencing Commission and the

25    report in 2012.
```

1          The Court has familiarized herself with it.

2          As the Court has come to understand, the report is a

3   result of a multi-year study by the Commission and compliments

4   and expands on the Commission's s 2009 report, the history of

5   the child pornography guidelines.

6          The focus of this is 2G2.2 of the guidelines and the

7   current guideline for non-production offenses, such as

8   possession, receipt, transportation and distribution of child

9   pornography, the four primary offense types, and the purpose is

10  to contribute to Congress and the stake holders in the criminal

11  justice system how Federal pornography offenders are sentenced,

12  incarcerated and supervised in re-entry to the community.

13         The key findings were that child pornography results

14  end up in indelible harm to the victims in production and

15  non-production offenses.  The current non-production guideline

16  warrants revision in view of its outdated and disproportionate

17  enhancement related to an offender's collective behavior as

18  well protect communities from sexually dangerous behavior.

19         A revised guideline that more fully accounts for the

20  full range of the offender's collecting behavior, degree of

21  involvement in a child pornography community and sexual

22  behavior would better promote sentences and statutory purposes

23  of sentencing, and the Commission reflects that Congress may

24  want to revise the penalty structure in distribution offenses

25  in newer and older technologies used by offenders to distribute

1  child pornography.

2          The Commission recommends to consider amending the

3  notice and restitution statutes for victims involving child

4  pornography.

5          The Court would note it has listened to what you said,

6  Mr. Peacock, in terms of what the Sentencing Commission is

7  considering, but it does see a distinction.

8          The emphasis is on non-possession distribution type

9  charges, and Mr. Harding, in this case, is charged in Counts 1

10 to 3 with distribution of child pornography, in violation of 18

11 United States Code, 2252(a)(2) and (b)(1), Count 4, possession

12 of child pornography, in violation if 2252(a)(4)(B) and (b)(2),

13 Count 5, attempt to coerce and entice a minor to engage in

14 sexual activity, in violation of 18 United States Code, 2422

15 (b), and Count 6, production of child pornography, in violation

16 of 18 United States Code, 2251(a)(e).

17         This 2012 report may speak to certain of the counts

18 that Mr. Harding is charged with.  The Court does not construe

19 the report as speaking to particularly Counts 4 through 6 of

20 the indictment against Mr. Harding, but understands what you

21 were trying to communicate to the Court and wants you to

22 understand, on behalf of Mr. Harding, that the Court has taken

23 that into consideration in its overall contemplation of the

24 appropriate sentence.

25         No doubt the sentence imposed, as 35353 tells us,

1    must -- sentence must be imposed to promote respect for the

2    law.

3             It is certainly the case that the sentence must not

4    only signal to Mr. Harding, but to others, that these types of

5    offenses are simply not tolerated, and that there are laws that

6    must be abided by and consequences if those laws are violated.

7    Sentencing is one component of how a Court reinforces the need

8    to have that respect for the law and as a law enforcement

9    officer, I know you, Mr. Harding, would understand that.

10            The sentence must provide just punishment for the

11   offense.

12            Now, the Government spoke to this, and it was also

13   included in the sentencing memorandum, that there is the

14   consideration for what is referred to as the just desserts

15   concept which carries the need for retribution, make the

16   punishment fit the crime, and need not to punish, but punish

17   justly.

18            One of the cases by the Government, United States

19   versus Pew, 515 F.3d, 1197, an Eleventh Circuit 2008 case, the

20   Eleventh Circuit quoted the Senate report regarding this

21   provision.

22            The purpose of the just desserts concept should be

23   reflected clearly in all sentences.  It is another way of

24   saying the sentence should reflect the gravity of the

25   Defendant's conduct from the public standpoint, the sentence

1  should be of a type and length that would adequately reflect,

2  among other things, the harm done or threatened by the offense,

3  and the public interest in preventing reoccurrence of the

4  offense.

5         From the Defendant's standpoint, the sentence should

6  not be unreasonably harsh under all circumstances of the case

7  and should not differ from the sentence given to other

8  similarly situated Defendants convicted of a similar offense

9  under similar circumstances.

10        When child pornography is produced in conjunction with

11  sexual abuse of children, as it was, the harm to the child

12  victim is magnified and perpetuated.

13        Because punishment should fit the crime, the more

14  serious the conduct, the greater the need for retribution and

15  the longer the sentence should be.  The seriousness -- it

16  follows that the greater the harm, the more serious the crime

17  and longer the sentence should be for the punishment to fit the

18  crime.

19        The sentence must afford adequate deterrence to

20  criminal conduct, that speaks in conjunction with the other

21  factors, and need to promote respect for the law, and the Court

22  has to weigh that factor as well.

23        It has been suggested to the Court that with the

24  greater enhancements in technology and different servers, and

25  going into darker rooms, that it has become increasingly more

```
 1    difficult to find persons who are engaging in child pornography

 2    and sexual abuse, as evidenced by chat messaging and exchanging

 3    of pictures and videos, and it becomes, in the Court's opinion,

 4    ever more important when persons are discovered and found and

 5    arrested and charged and ultimately sentenced, that that

 6    sentence be used in part as one of the factors to not only

 7    deter the Defendant in this particular case, but particularly,

 8    given the nature of this crime and difficulty in finding

 9    criminals who engage in this kind of activity, a general

10    deterrence as to other criminal activity.

11          Then there is a need to protect the public from

12    further crimes of the Defendant.

13          As the Court spoke to, Mr. Harding's chat messages

14    demonstrate abusing children was deeply engrained in who he

15    was, who he is, or who he was during this period of time.

16          The data found on Mr. Harding's electronic devices

17    indicate that he has been collecting and viewing child

18    pornography since 2008, actively abusing prepubescent children

19    for years, no indication that he was going to stop.

20          All we know is Special Agent Rey's discovery of what

21    was going on brought an end to it.  That is all we know.

22          When the Court considered the need to protect the

23    public from further crimes of the Defendant, while the Court is

24    not going to go through all 53 pages of Docket Entry 103, which

25    is the notice of filing victim statements, the Court is going
```

1    to highlight a few portions that seem to strike the Court as

2    speaking as poignantly as can be spoken about the need to

3    protect the public from further crimes of the Defendant.

4         One such passage comes from page seven of 53 at Docket

5    Entry 103 and it is entitled -- it has a caption that says A

6    Mother's Fear.  Every parent knows that there are individuals

7    out there they desperately want to keep their children away

8    from, the sadistic predators, the merciless fiends that would

9    prey on young lives.  Each horrific tragic tale that appears in

10   the paper brings, not my child, please, not my child.  My

11   daughter has already suffered so much -- this is written by the

12   mother of a victim in the photos and/or videos.

13        My daughter has already suffered so much, it seems an

14   outrage that anyone would put her at further risk, but then

15   there is the cold reality, who bothers to risk prison to

16   acquire pictures of a child being tortured and abused?  Exactly

17   the type of fiend a parent fears.

18        Certainly the people who pass on the pictures know

19   they are exposing the children in them to the risk of being

20   further victimized, but it must not matter to them.

21        The more widely distributed the pictures become, the

22   larger the audience, the greater chance they fall into the

23   hands of fiends.  The suffering is not enough.  Who wants to

24   follow up with a more personal relationship?  I do not want my

25   daughter viewed by friends as a victim.  I do not want to have

1   her worry if she sees a flash of recognition, they may

2   recognize her not as a person, but a person of abuse.

3          On page eight of 103, I believe it is from the same

4   victim, the same mother.  Under the subheading Responsibility,

5   she says, I can find no words to express the fury I feel at

6   those who participate in this evil or my scorn for any attempt

7   to minimize the responsibility by feeble claims that the crime

8   was victimless.

9          My daughter is a real person, she was horribly

10  victimized to provide this source of entertainment.  She is

11  exploited anew each and every time her suffering is copied,

12  traded or sold.  While the crime is clearly conscienceless, it

13  is hardly victimless.

14         I asked my daughter what she wanted most to ask of the

15  judge.  Her request, please don't let them pretend no one is

16  getting hurt.

17         She had some words for the Defendant as well.  Don't

18  you know no one should do that to a little girl, don't you know

19  it hurts?

20         The chat messages, in the Court's opinion, demonstrate

21  that Mr. Harding was unable to abide by the law.  He chose to

22  view and distribute child pornography while he was not only

23  employed as a police officer, but while he was on duty.

24         He had a -- has a pervasive and deep seeded attraction

25  to prepubescent girls.  He specifically stated in one of the

1   text messages that he is attracted to girls in the prepubescent

2   age range.

3       The Court also, in considering the need to avoid

4   unwarranted sentencing disparities, does take note of the

5   Government sentencing memorandum, and in particular, on pages

6   15 to 18 of the Government's sentencing memorandum, the

7   Court -- the Government presents the Court with quite a bit of

8   case law that would suggest to the Court that the range of

9   sentence under the guidelines for this defendant, Mr. Harding,

10  would not present sentencing -- a sentencing disparity.

11      So, this is what the Court has considered, this is the

12  evidence, this is how the Court has applied and considered the

13  evidence in the context of all of the factors the Court must

14  consider in imposing a sentence on you, Mr. Harding.

15      And based on all of the factors and the case law and

16  the argument and the evidence and the briefing and the

17  testimony, the Court reaches the conclusion that it is the

18  judgment of this Court that you, Mr. Michael Edwin Harding, are

19  committed to the Bureau of Prisons to be imprisoned for life.

20      The term consists of 240 months as to Counts 1 through

21  4, life as to Count 5, and 360 months as to Count 6, all to be

22  served concurrently.

23      It is further ordered that, pursuant to 18 United

24  States Code, 3664(d)(5), that the victims' losses are not yet

25  ascertainable, therefore the Court shall set a date for the

 1   final determination of the victims' losses, not to exceed 90

 2   days after sentencing.

 3        Upon release from imprisonment, Mr. Harding shall be

 4   placed on supervised release for a term of life on Counts 1

 5   through 6, all such terms to run concurrently.

 6        Within 72 hours of release from the custody of the

 7   Bureau of Prisons, the Defendant shall report in person to the

 8   Probation Office in the district to which the Defendant is

 9   released.  While on supervised release, the Defendant shall not

10   commit any crimes, shall be prohibited from possessing a

11   firearm or other dangerous devices, shall not possess a

12   controlled substance, shall cooperate in the collection of DNA

13   and comply with the standard conditions of supervised release,

14   including the following special conditions:

15        Mr. Harding shall not possess or use any data

16   encryption technique or program.  He shall not possess or use

17   any computer except with the prior approval of the Court, may

18   use a computer in connection with authorized employment.

19        Mr. Harding shall permit third party disclosure to any

20   employer or potential employer concerning any computer related

21   restrictions imposed upon Mr. Harding.

22        Mr. Harding shall participate in an approved mental

23   health treatment program.  Mr. Harding shall contribute to the

24   cost of services rendered based on ability to pay or third

25   party payment.

```
 1            Mr. Harding shall participate in an approved treatment

 2    program for drug and/or alcohol abuse and abide by all

 3    supplemental conditions of treatment.  Participation may

 4    include inpatient and outpatient treatment.  Mr. Harding shall

 5    contribute to the cost of services rendered based on ability to

 6    pay or availability of third party payment.

 7            Mr. Harding shall have no personal mail, telephone or

 8    computer contact with children or minors under the age of 18

 9    years or with any victim.

10            Mr. Harding shall not be involved in any children's or

11    youth organization.

12            Mr. Harding shall participate in a sex offender

13    treatment program to include psychological testing and

14    polygraph examination.  Participation may include inpatient or

15    outpatient treatment as deemed necessary by the treatment

16    provider.  Mr. Harding shall contribute to the costs of

17    services rendered based on ability to pay or availability of

18    third party payment.

19            Mr. Harding shall not buy, sell, exchange, possess,

20    trade or produce visual depictions of minors or adults engaged

21    in sexually explicit conduct.  He shall not correspond or

22    communicate in person, by mail, telephone or computer with

23    individuals or companies offering to buy, sell, trade, exchange

24    or produce visual depictions of minors or adults engaged in

25    sexually explicit conduct.
```

Pauline A. Stipes, Official Federal Reporter

```
1           Mr. Harding shall submit to the United States

2    Probation Officer conducting periodic unannounced searches of

3    the Defendant's person, property, house, residence, vehicles,

4    papers, computers, other electronic communication or data

5    storage devices or media, including retrieval and copying of

6    all data from the computer and any external or internal

7    peripherals and effects at any time, with or without warrant by

8    any law enforcement or Probation Officer with reasonable

9    suspicion concerning unlawful conduct or a violation of a

10   condition of probation or supervised release.

11          The search may include the retrieval and copying of

12   all data from the computers and any external and internal

13   peripherals to ensure compliance with other supervision

14   conditions and/or removal of such equipment for the purpose of

15   conducting a more thorough inspection; and to have installed on

16   Mr. Harding's computers, at Mr. Harding's expense, any hardware

17   or software systems to monitor his computer use.

18          Mr. Harding shall comply with the requirements of the

19   Sex Offender Registration and Notification Act, 42 U.S.C.

20   Section 16901, as directed by the Probation Officer, the Bureau

21   of Prisons or any state offender registration agency in which

22   he resides, works, is a student, or was convicted of a

23   qualifying offense.

24          It is further ordered that Mr. Harding shall pay

25   immediately to the United States a special assessment of $100
```

```
1    for each of Counts 1 through 6, for a total of $600.

2              Implicit in the Court's sentencing, but the Court will

3    state explicitly, the motion for downward variance is denied.

4              The Court took into account all of the factors that

5    the defense raised in suggesting to the Court that it should

6    vary downward from what the guidelines tell the Court is the

7    appropriate sentence.

8              Defense focused primarily on Mr. Harding's background.

9    The Court addressed that.  The Court takes note of certain

10   difficulties and traumas in his background.

11             The Court took into account Dr. Brannon's testimony

12   and the risk factors involved in reoffending and the age limits

13   he has spoken about and I realize he spoke in a general way and

14   not a specific way, and the Court evaluated the arguments of

15   the Sentencing Commission's report in 2012 about child

16   pornography guidelines.

17             All of the other bases that the Court has relied upon

18   to deny the motion for downward variance are those the Court

19   has just set forth in its pronouncement of the sentence.

20             So the total -- therefore, the total sentence is life

21   imprisonment, life supervised release and a $600 special

22   assessment.

23             Now that sentence has been imposed, does Mr. Harding

24   or counsel object to the findings of fact and the manner in

25   which the Court announced?
```

1     MR. PEACOCK:  Yes, ma'am.  Do you want me to state

2     those in particularity?

3          THE COURT:  I defer to you.

4          MR. PEACOCK:  As I noted in my motion for downward

5     variance, it is the defense's position the guideline range

6     which the Court relied on heavily in this case is arbitrary and

7     excessive for the reasons I laid out, actually being criticized

8     by the Sentencing Commission itself in this case.

9          Beyond that, Your Honor, I think the sentence the

10    Court has imposed is substantively unreasonable under the

11    circumstances and going to the maximum sentence possible is not

12    warranted in this case.

13         Those are our objections.

14         THE COURT:  Okay.

15         Does the Government have any objections?

16         MR. FUNK:  No.

17         THE COURT:  Mr. Harding, you have a right to appeal

18    the sentence imposed.  Any Notice of Appeal must be filed

19    within 14 days of the entry of the judgment.  If you are unable

20    to pay for the cost of appeal, you may appeal in forma

21    pauperis.

22         MR. PEACOCK:  Your Honor, if I may.

23         THE COURT:  Yes.

24         MR. PEACOCK:  My notes reflected different facts other

25    than what the Court announced at sentencing.  For the record, I

```
1    would reserve a procedural reasonableness based on the factual
2    differences.
3            THE COURT:  Do you want to articulate the factual
4    differences?
5            MR. PEACOCK:  There are numerous ones.  If the Court
6    wants me to elaborate, I certainly can.
7            THE COURT:  I think if you want to make a record of
8    what those factual differences are, that you should put them on
9    record.
10           MR. PEACOCK:  Sure.
11           Among those, Your Honor, I think the Court said that
12   the first time that C.W. relayed the events that occurred, that
13   she said that Mr. Harding put her hand over his penis, which I
14   don't think is accurate.
15           As I recall the testimony, it was that she said he put
16   his own hand there, and she remained on the other end of the
17   couch.
18           Secondly, Your Honor indicated that Ashley Harding was
19   unaware that Mr. Harding was abusing drugs, but she testified
20   herself that she abused drugs with Mr. Harding on several
21   occasions.  So, I just don't think that is an accurate
22   conclusion.
23           Your Honor, in regard to Dr. Brannon's testimony, the
24   Court referred to the risk falling off at age 55 unless the
25   Defendant had some kind of psychopathic disorder.
```

1          I don't think that is what Dr. Brannon said.  I think

2    what was addressed was an anti-social personality disorder, and

3    for the record, Dr. Brannon concluded that Mr. Harding does not

4    have anti-social personality disorder, he may have some of the

5    characteristics.

6          Also, Dr. Brannon concluded that Mr. Harding had many

7    characteristics which indicated a respect for society and

8    ability to operate in society.

9          Your Honor, at one point, mentioned a pattern of child

10   abuse over a period of four years.  I don't think there is any

11   support in the record for that.  As best I can establish, the

12   earliest the record goes back in that regard would be 2014,

13   which by my accounting would be one year.

14         Your Honor did not include the letters provided on

15   behalf of Mr. Harding, which I had filed and submitted on his

16   behalf.

17         THE COURT:  Yes, the Court has -- the Court at the

18   very inception of the proceeding on the 16th, when we commenced

19   the hearing, the sentencing --

20         MR. PEACOCK:  Yes, I know you acknowledged receiving

21   them.

22         THE COURT:  The Court read all of those letters.

23         The letters the Court received and reviewed included

24   letters from Julie Harding dated April 28, 2016, and of course

25   we had Julie Harding here to testify.  And Elizabeth Perry as

```
 1    well, and Elizabeth Perry was here to testify.
 2          And there was a letter from Judith Sohr, as best I
 3    can -- Sohr, S-O-H-R, April 29, 2016, and from Christina Stein,
 4    March 28, 2016, Michael Sohr, April 10, 2016, Doug Stefano, Sue
 5    Ann Pastano, MaryJo Jennings, Ellen Brushwinger, Kathleen
 6    Olson, George Olson, September 26, 2015, and there are a number
 7    of others.
 8          The Court has considered each of these letters as
 9    well.  I neglected perhaps -- and the newspaper articles that
10    spoke to Mr. Harding and his background as a police officer,
11    and state publications, being officer of the year, his
12    graduation, and you are correct that the Court overlooked in
13    today's pronouncement that it had considered it, but the Court
14    has considered that and just neglected to bring that up.
15          MR. PEACOCK:  Finally, Your Honor, I would just voice
16    that I had a continuing objection against the hearsay nature of
17    the evidence in this case and any confrontation clause
18    requirements.
19          We basically got secondhand information from
20    individuals who are nine and five respectively, and I don't
21    think that is sufficient for the Court to rely on to impose
22    such a severe sentence.
23          THE COURT:  Okay, I think you made that as to
24    Mrs. Harding's testimony.  Did you make those as to Detective
25    LaGrega?
```

```
 1              MR. PEACOCK:  I don't believe I did, Your Honor, but I
 2     would ask the Court to give that consideration and that I think
 3     the Court is giving it too much weight.
 4              THE COURT:  Okay.
 5              The only response -- and I appreciate you putting your
 6     comments on the record, they are part of the record -- is that
 7     the Court, in trying to do its best over two days worth of
 8     testimony, to jot its notes and be able to recap and summarize
 9     its notes from each and every witness, acknowledges that -- and
10     I think beginning with Sheila LaGrega, that I may have
11     misspoken as to what took place on the first day versus another
12     day in terms of what C.W. told her as to whether Mr. Harding
13     put his own hand on his penis, and on another occasion whether
14     he had C.W. put her hand on his penis.
15              The Court recognizes that it may have spoken maybe too
16     generally about which conversation took place when and what
17     happened, but -- and with respect to Dr. Brannon, the Court
18     acknowledges what he did say and what he didn't say.
19              The Court may have -- when he spoke about psychopathic
20     disorder, he then went on to talk about anti-social behavior.
21              So, while the Court perhaps may have misused certain
22     words, it doesn't change your objections, but I want you at
23     least to know that the Court thoroughly understands the essence
24     of what every witness has said, does not -- did not
25     fundamentally miss in its own opinion any fundamental point
```

1    made by any of the witnesses, weighed each and every bit of

2    evidence carefully and with great difficulty, and was speaking

3    at such length about what the Court considered because it is

4    such a significant sentence.

5         I want everyone to know why the Court imposed the

6    sentence that it did, and in doing so without the benefit of a

7    full transcript in front of me, rather the notes I had taken

8    along the way, did its best effort to summarize, but believes

9    each and every witness was heard and listened to and weighed as

10   part of the 3553 factors that the Court had to consider in

11   making its decision to impose a sentence.

12        MR. PEACOCK:  Your Honor, finally, if I may, I would

13   ask the Court make this sentence concurrent to any sentence in

14   the State of Florida, St. Lucie County, and that is 15-CF-2947,

15   as is read in paragraph 46 of the PSI.

16        This will have a great effect on Mr. Harding's

17   security rating if it is not.

18        THE COURT:  Which paragraph?

19        MR. PEACOCK:  Paragraph 46.

20        THE COURT:  Does the Government have a position on

21   that?

22        MR. FUNK:  I don't think the State Court could be

23   bound by this Court saying it should run concurrently.  I don't

24   believe it would be appropriate to run concurrently.

25        The offenses are what you take into consideration.

1    The specific offense characteristics that include the sexual

2    battery, he is charged in separate courts with separate

3    offenses, it is not appropriate to be concurrent.

4            MR. PEACOCK:  Under Federal law, I believe jeopardy

5    would attach.  That conduct has been used as a specific

6    enhancement in his case.  That is appropriate where it is

7    concurrent.

8            THE COURT:  He hasn't been sentenced in State Court

9    yet.  If he had already been sentenced, I could see

10   entertaining a request to make it concurrent.

11           MR. PEACOCK:  You could do it to make it concurrent to

12   that case.

13           THE COURT:  What other requests are being made?

14           MR. PEACOCK:  I would like a recommendation that he be

15   housed as close as possible to this area.

16           THE COURT:  South Florida?

17           MR. PEACOCK:  Yes, ma'am.

18           THE COURT:  The Government's position on that.

19           MR. FUNK:  No objection where he is housed.

20           THE COURT:  The Court will make a recommendation that

21   Mr. Harding be housed in a facility, if possible, in South

22   Florida.

23           Mr. Harding, it is the ultimate decision and

24   responsibility of the Bureau of Prisons to be determined where

25   you are placed.

1          My recommendation will be a factor considered in the

2     context of all factors where they place inmates.

3          As to the request for the Court to make this sentence

4     concurrent with a State sentence that has not been imposed yet,

5     the Court is going to abstain from doing that.

6          The Court will limit its ruling and imposition to that

7     which is before it and can really only consider, and it was

8     quite a bit.

9          I am most comfortable imposing a sentence as relates

10    to what has occurred before this Court.

11         MR. PEACOCK:  Your Honor, in the event you are not

12    aware, by doing that you are making it consecutive under the

13    statute.

14         The way BOP considers these sentences, they treat

15    something you don't make concurrent as consecutive.  I don't

16    think under the circumstances that is warranted.

17         That will mean his security rating in the Federal

18    custody will rise because he has a pending sentence from State

19    Court from another jurisdiction and it is just piling on more

20    and more.  I just don't see that is appropriate, Your Honor.

21         THE COURT:  And what exactly -- rearticulate what your

22    position is and why, why you object to it.

23         MR. FUNK:  He is being charged in separate courts with

24    separate offenses.  While the Government can put forward facts

25    of the offenses which are charged in State Court, he is not

```
 1   charged with sexual battery here, and it is not appropriate

 2   under the circumstances to essentially negate a sentence in

 3   State Court by saying it is automatically going to run

 4   concurrent.

 5            THE COURT:  What are the charges in State Court?

 6            MR. FUNK:  The charges pending, I don't know if it is

 7   warranted now, two counts of sexual battery, a mandatory life

 8   sentence, and the victims listed are C.W. and H.W.

 9            THE COURT:  Having considered the positions put forth

10   by both sides, the Court is going to adhere to the position not

11   making it concurrent, not affirmatively saying it is

12   concurrent.

13            MR. PEACOCK:  All right.

14            THE COURT:  Anything further?

15            MR. FUNK:  Yes, Your Honor.

16            Is the Court incorporating into the judgment and

17   commitment the preliminary order of forfeiture, March 2nd,

18   2016, Docket Entry 80?

19            THE COURT:  Docket Entry 80, preliminary order of

20   forfeiture as to Michael Edwin Harding, and that includes the

21   PNY attached thumb drive, serial number indicated, one Lexar

22   model JD Mercury thumb drive with the serial number associated

23   with it, one LGD800 cell phone with the serial number

24   associated with it.  This is in paragraph two of the

25   preliminary order of forfeiture, subsection D.
```

```
 1              Samsung SMG and -- G 9, rather, cellular telephone
 2    with the serial number associated with it.
 3              The Court does incorporate the order of forfeiture,
 4    and asks the Government provide a forfeiture order within the
 5    next three days.
 6              Anything further?
 7              MR. FUNK:  For the issue of restitution, we need a
 8    court date if that is necessary.
 9              THE COURT:  Is that something we want to get back to
10    counsel with, Lakeshia?
11              THE COURTROOM DEPUTY:  Yes, please.
12              THE COURT:  That needs to take place within 90 days.
13              What is the likelihood that the hearing will proceed?
14              MR. FUNK:  I think there is a low likelihood.
15              MR. PEACOCK:  I think there is a real good likelihood.
16              THE COURT:  We'll endeavor to give you the date, and
17    keep us apprized if the date is no longer needed or the hearing
18    is not necessary.
19              Anything further?
20              MR. FUNK:  No.  Thank you.
21              MR. PEACOCK:  Thank you.
22              THE COURT:  I thank you.
23              I do -- as difficult as it might seem to hear from me,
24    Mr. Harding, and I understand if it falls on deaf ears, but I
25    do wish you well.  I hope you find the ability to get treatment
```

```
1   and rehabilitation through the services that are afforded you.
2            You have the support of your family, and that is very
3   important.  I want to acknowledge and thank your family and
4   friends of family for coming.
5            Just as I want to acknowledge having Mrs. Harding,
6   Ashley Harding, here and those who may have come to support
7   her, and wish you and your family well on a going forward
8   basis, and you get all of the support and services you need to
9   work through what you have been through.
10            I thank counsel for their patience and thoroughness in
11   putting together all of the information for the Court to
12   consider in this sentencing.
13            So, thank you.
14            (Thereupon, the proceedings concluded.)
15                            * * *
16            I certify that the foregoing is a correct transcript
17   from the record of proceedings in the above matter.
18
19       Date: June 5, 2016
20                /s/ Pauline A. Stipes, Official Federal Reporter
21                     Signature of Court Reporter
22
23
24
25
```

Pauline A. Stipes, Official Federal Reporter